IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────

EON SHEPHERD,

                              Plaintiff,          Civil Action No.
                                                  9:10-CV-1524 (TJM/DEP)

          v.

BRIAN FISCHER, *et al.*,

                              Defendants.

─────────────────────────────

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

EON SHEPHERD, *Pro Se*
96-A-0356
Clinton Correctional Facility
P.O. Box 2002
Dannemora, NY 12929

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN          CATHY Y. SHEEHAN, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

# REPORT AND RECOMMENDATION

*Pro se* plaintiff Eon Shepherd, a New York State prison inmate who has been granted *in forma pauperis* ("IFP") status, has brought this action against the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") and several DOCCS employees, pursuant 42 U.S.C. § 1983, alleging that his civil rights have been violated.[1] Plaintiff's complaint sets forth an amalgamation of seemingly unrelated claims.

Currently pending before the court is a motion filed by the defendants seeking the entry of partial summary judgment dismissing certain of plaintiff's claims on the merits. For the reasons set forth below, I recommend that defendants' motion be granted, in part, and otherwise denied.

---

[1]    It now appears that the plaintiff was improvidently granted IFP status because, prior to commencing this action, he had accumulated three strikes for purposes of 28 U.S.C. § 1915(g). Specifically, the following three actions filed by the plaintiff while incarcerated were dismissed on initial review pursuant to 28 U.S.C. § 1915(d), which was amended and recodified in 1996 as 28 U.S.C. § 1915(e): (1) *Shepherd v. Conroy*, No. 95-CV-8385, Dkt. No. 3 (S.D.N.Y. filed Oct. 2 1995); (2) *Shepherd v. Fraisher*, No. 96-CV-1525, Dkt. No. 3 (S.D.N.Y. filed Mar. 4, 1996); and (3) *Shepherd v. Harwood*, No. 96-CV-6413, Dkt. No. 3 (S.D.N.Y. filed Aug. 23, 1996). The issue, however, is now moot. Pursuant to the inmate authorization form signed by the plaintiff at the outset of the action, the full amount of the applicable filing fee has now been collected. Docket Entry Dated Aug. 30, 2011.

I.    BACKGROUND[2]

Plaintiff is an inmate currently in the custody of the DOCCS. *See generally* [Dkt. No. 45](). At various times relevant to his claims in this action, Shepherd was confined to the Upstate, Clinton, Five Points, Shawangunk, and Green Haven Correctional Facilities. [Dkt. No. 45]().

The claims set forth in plaintiff's complaint, as amended, are predicated upon occurrences falling into several categories, including sexual assault, excessive force, violation of plaintiff's freedom of religion, denial of access to the courts, deprivation of procedural due process, and the denial of adequate medical care. The following accounts, drawn principally from plaintiff's amended complaint, generally describe the events giving rise to his various claims.[3]

---

[2]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[3]    Although defendants, through their pending motion, seek wholesale dismissal of certain of plaintiff's claims, they also request dismissal of other causes of action as against several defendants based on a lack of personal involvement. For that reason, the following recitation addresses all plaintiff's claims, rather than only those of which defendants seek dismissal.

A.    Sexual Assault

On November 3, 2007, while being pat frisked by defendant Corrections Officer Jones, plaintiff was subjected to touching in private areas and in a sexual manner.[4] Dkt. No. 45 at 3. Defendant Corrections Officer Whipple observed defendant Jones' conduct, told plaintiff that Jones was permitted to search him in that manner, and did nothing to stop Jones' conduct. *Id.* at 4. Plaintiff was exposed to similar conduct, as well as sexual comments, while being pat frisked by defendant Corrections Officer Carlee on April 20, 2010, April 22, 2010, and in May 2010. *Id.* at 4, 5. Plaintiff alleges that during the pat-frisk on April 20, 2010, defendant Sergeant Barber witnessed the assault but did not reprimand defendant Carlee for his conduct. *Id.* at 4. During the pat-frisk by defendant Carlee on April 22, 2010, defendant Corrections Officer Bower allegedly watched the assault but did nothing to stop it. *Id.* Defendant Bower also allegedly grabbed plaintiff's genitals during a pat frisk on April 29, 2010. *Id.* at 4. On June 17, 2010, defendant Corrections Officer Prebalick, while pat frisking

---

[4]    Plaintiff's amended complaint names a "Corrections Officer Jones" and a "Sgt. Jones" as defendants. *See, e.g.,* Dkt. No. 45 at 1, 2, 3-4, 5, 22, 29, 30. It is clear that plaintiff asserts only an excessive force claim against defendant Corrections Officer Jones (referred to as "defendant Jones" for purposes of this report) based on the alleged sexual assault during the pat frisk. *See id.* at 3-4, 29. Defendant Sergeant Jerry Jones (referred to as "defendant Sgt. Jones") is sued for his alleged failure to protect plaintiff from the alleged use of excessive force by defendants Prebalick, Cioffa, and Evans, as well as his involvement in providing alleged inadequate medical treatment to plaintiff. *Id.* at 5, 22, 30.

the plaintiff in a facility special housing unit ("SHU"), sexually accosted plaintiff in a similar manner. *Id.* at 4. Plaintiff complained to corrections officials concerning those incidents, and was told by defendant Corrections Officer Bower that he would be sexually molested and harassed as long as he continued to write sexual harassment grievances.[5] *Id.* at 4.

## B. Excessive Force

On May 6, 2010, while being escorted back to his cell, plaintiff was assaulted by defendant Prebalick, defendants Corrections Officers Cioffa and Evans, and otherwise unidentified individuals. Dkt. No. 45 at 5. Plaintiff alleges that defendant Sgt. Jones witnessed the assault but did nothing to intervene or protect him from harm. *Id.* As a result of the incident, plaintiff suffered injuries to his right wrist, shoulder, low back and knees. *Id.* Plaintiff alleges that defendant Prebalick assaulted him out of retaliation for his filing grievances against other corrections officers. *Id.* at 5-6.

On several occasions throughout 2010, several defendants, including defendant Sergeant Maynard and defendants Prebalick, Carlee,

---

[5]     Plaintiff's amended complaint does not identify the correctional facility in which these alleged incidents occurred.

Below, and Rozell also allegedly applied excessive force in pulling plaintiff's dreadlocks out of his head. Dkt. No. 45 at 6-10.

    C.    <u>Interference with Freedom of Religion</u>

Shepherd, a practicing Rastafarian, recounts several incidents of alleged interference with his right to freely exercise his chosen religion occurring between October 2008 and November 2010. On October 7, 2008, plaintiff was not served a religious meal associated with a religious celebration.[6] Dkt. No. 45 at 6. On November 3, 2008, plaintiff's religious meal was served on a tray that was regularly used to serve meat in violation of plaintiff's religious beliefs. *Id.* On May 25, 2009, while Shepherd was confined at Clinton, an unidentified corrections officer sued as "John Doe" ordered plaintiff to dismantle his dreadlocks, which are worn to demonstrate a commitment to the god worshiped by Rastafarians, and then began pulling the dreadlocks. *Id.* According to plaintiff, it is against his religious beliefs to have his dreadlocks touched. *Id.* Similarly, plaintiff alleges that in or about November 2010, defendant Rozell touched plaintiff's dreadlocks in violation of his beliefs, and defendant Sergeant Roew, who witnessed the incident, did nothing to stop it. *Id.* at 10.

---

[6]    Plaintiff alleges that he informed defendant Bellnier about the missing meal, and that defendant Bellnier advised plaintiff that he would look into the matter. Plaintiff does not, however, allege that defendant Bellnier caused the meal to not be served or that he failed to take appropriate action in response to plaintiff's complaint. Dkt. No. 45 at 6.

Plaintiff further alleges that between May and December 2009, while incarcerated at Clinton and Shawangunk, he was denied the right to attend Rastafarian religious services for various reasons, including because his name was not placed on a call-out lists for religious services, he cannot walk up and down stairs to the area where the services were being held due to a physical impairment, and the facility in which he was housed did not offer Rastafarian services. *Id.* at 7-8. While at Clinton during this period of time, plaintiff informed defendant Superintendent Artus that he was being denied access to services, but he did not receive a response. *Id.* at 8.

Following plaintiff's transfer into Five Points, on or about December 3, 2009, he was verbally harassed regarding his religious preferences and his dreadlocks by unidentified corrections officers. Dkt. No. 45 at 8. Plaintiff specifically alleges that in March 2010, defendant Basket verbally harassed him regarding his religion. *Id.* at 9.

On or about May 5, 2010, plaintiff was denied a religious meal. Dkt. No. 45 at 9. When plaintiff complained to ZenZen, the deputy superintendent of programs at the facility in which plaintiff was confined, he was told he had not requested a religious meal and was denied access to the standards, policies, and procedures for receiving religious meals. *Id.*

On or about July 23, 2010, while at Upstate, plaintiff was served a religious meal on a tray in which meat is customarily served, in violation of his religious beliefs. Dkt. No. 45 at 9. As a result, plaintiff was unable to consume the religious meal. *Id.* On October 7, 2010, plaintiff was again denied a religious meal prepared in celebration of the Rastafarian Negust. *Id.* Plaintiff informed defendant Superintendent Rock about his failure to receive the religious meal, but Rock never responded. *Id.*

D.   Court Access

Plaintiff's complaint sets forth two instances of alleged interference with his access to the courts, both involving claims that prison officials lost or misplaced his legal documents. The first incident is alleged to have occurred in December 2009, in connection with plaintiff's transfer from Clinton to Five Points. Dkt. No. 45 at 11. Plaintiff alleges that during the course of that transfer one of two draft bags containing legal documents and other property was misplaced and never recovered. *Id.* As a result, plaintiff lost documents pertaining to civil matters pending in the Southern and Northern Districts of New York, transcripts involving criminal matters pending in Kings and Richmond Counties, and documents concerning Article 78 proceedings. *Id.* Plaintiff informed defendant Superintendent Lempke and defendant Deputy Superintendent for Security Colvin of his

missing legal papers, but neither of those individuals remedied the problem. *Id.*

The second incident occurred in June 2010, in connection with plaintiff's transfer into another prison facility. Dkt. No. 45 at 11-12. Plaintiff completed the necessary paperwork to arrange for a bag of active legal documents to be shipped to the next prison facility. *Id.* at 11-12. The bag was mailed instead to the plaintiff's home, however, and upon its return to the plaintiff, some of the documents were missing. *Id.* at 12. Plaintiff alleges that the missing documents were intentionally destroyed in retaliation for his filing of complaints and grievance while confined at Five Points. *Id.* As a result of the loss of legal documents, plaintiff contends he was unable to appeal a civil matter pending in the Northern District of New York, file Article 78 proceedings pursuant to state law, and file post-conviction motions in Richmond and Kings Counties. *Id.*

E.    Procedural Due Process

Plaintiff's complaint, as amended, alleges two separate instances involving the denial of procedural due process. The first involves a disciplinary hearing conducted on April 26, 2008, by defendant Deputy Superintendent of Programs Cunningham, resulting in a finding of guilt and a penalty of 180 days in disciplinary SHU confinement, with a

corresponding loss of packages, telephone, and commissary privileges, and a recommended forfeiture of good time credits. Dkt. No. 45 at 12-13. Plaintiff claims that he was deprived of (1) effective assistance in preparation for the hearing, (2) an impartial hearing officer, and (3) access to witnesses and documents. *Id.*

The second due process violation alleged stems from a misbehavior report issued on January 28, 2010, resulting in a disciplinary hearing commenced by defendant Ramus on February 2, 2010. Dkt. No. 45 at 14. At the hearing, plaintiff raised objections to alleged procedural violations and evidence and witnesses presented, and also protested defendant Ramus' refusal to call plaintiff's neurologist as a witness. *Id.* at 13-14. Plaintiff alleges that defendant Ramus' bias is reflected in the guilty determination and resulting penalty that included ten months of disciplinary confinement, a corresponding loss of privileges, and a recommended loss of good time credits. *Id.* at 14. Although defendant Bezio affirmed the determination, it was later administratively reversed on October 28, 2010. *Id.*

F.    Deliberate Medical Indifference

The vast majority of plaintiff's amended complaint addresses medical care provided to him at the various facilities in which he was housed at the relevant times. Plaintiff's complaints center upon a chronic lumbar back condition, a right knee condition, chronic migraine headaches, asthma, numbness in his right wrist and shoulder, "blurry double vision," and a urology condition. Dkt. No. 45 at 14. Plaintiff claims that at various times during his incarceration, he was (1) denied adequate pain medication, knee and back braces and a cane, (2) confined in a facility requiring him to navigate stairs, and (3) deprived of requested medical care. *Id.* at 14-28.

II.    PROCEDURAL HISTORY

This action has an extensive procedural history. The suit was filed in the Southern District of New York in October 2010, but was subsequently transferred to this district by order issued by Chief District Judge Loretta A. Preska on December 10, 2010. Dkt. Nos. 1, 3. Upon transfer to this district, on May 11, 2011, Senior District Judge Thomas J. McAvoy issued a decision, following an initial review of plaintiff's original complaint, dismissing certain of his claims and otherwise directing service of the summons and complaint. Dkt. No. 5. Since that time, plaintiff has filed an amended complaint in the action, which was submitted on August 17,

2011, and accepted for filing by the court in its entirety. Dkt. Nos. 45, 78. In addition, four separate motions for preliminary injunctive relief have been filed by the plaintiff and denied by the court. Dkt. Nos. 49, 78, 159, 161, 163, 168, 189, 192.

In his amended complaint, the currently operative pleading, plaintiff identifies numerous defendants by name and others as "Doe" defendants. Dkt. No. 45 at 2-3. Plaintiff's amended complaint asserts the following causes of action: (1) excessive force against defendants Jones, Carlee, Bower, Prebalick, Cioffa, Evans, John Doe, Maynard, Beliow, Rozell, Cambria, Colvin, and Lempke;[7] (2) due process against defendants Cunningham, Ramus, Bezio, and Fischer;[8] (3) verbal harassment against defendants Bower, Prebalick, John Doe, Maynard, and Basket; (4) deliberate medical indifference against defendants Holmes, Parmer, Smith, Weissman, Chesbrough, Bellnier, Rock, Lashaway, John Doe, Cusack, Johnson, Weinstock, Lempke, Colvin, Sgt. Jones, Atkinson, Fairchild, Hawthorne, Roew, Thomas, Perez, Bellamy, Fischer, Wright,

---

[7]     Plaintiff asserts the excessive force claims against defendants Colvin and Lempke based on their roles as supervisors.

[8]     Plaintiff asserts the due process claims against defendants Bezio and Fischer based on their roles as supervisors.

Amatucci, Artus, Clemons, Prebalick;[9] (5) retaliation against defendants Prebalick, Lempke, Colvin, Carlee, Atkinson, Chesbrough, Fairchild, Holmes, and Bower;[10] (6) free exercise and Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims against defendants John Doe, Evans, Artus, Rock, Bellnier, Fischer, Lempke, Colvin, Maynard, Carlee, Prebalick, Beliow, Rozell, and Basket;[11] and (7) denial of access to the courts against defendants Prebalick, Lempke, and Colvin;[12] (8) failure to protect plaintiff from harm against defendants Whipple, Barber, Bower, Roew, Lempke, Colvin, and Sgt. Jones.[13] As relief plaintiff seeks

---

[9]    Plaintiff asserts the deliberate medical indifference claims against defendants Bellnier, Rock, Lempke, Colvin, Bellamy, Fischer, Wright, and Artus based on their roles as supervisors. In addition, plaintiff asserts the deliberate medical indifference claims against defendants Johnson, Weinstock, Weissman, Hawthorne, and Smith based on their capacities as supervisors, as well as their direct role in treating plaintiff.

[10]    Plaintiff asserts the retaliation claims against defendants Lempke and Colvin based on their roles as supervisors.

[11]    Plaintiff asserts the free exercise and RLUIPA claims against defendants Artus, Rock, Bellnier, Fischer, Lempke, and Colvin based on their roles as supervisors.

[12]    Plaintiff asserts the denial of access to the courts claims against defendants Lempke and Colvin based on their capacities as supervisors.

[13]    Plaintiff's amended complaint explicitly sets forth twenty-nine causes of action. Dkt. No. 45 at 29-33. Those causes of action, however, are not organized in any meaningful or logical manner. Accordingly, the eight categories of claims listed above are intended to consolidate plaintiff's causes of action as they are asserted in the amended complaint. In addition, based on my review of the pleading, and mindful of my obligation to extend special solicitude to *pro se* litigants, I have construed the amended complaint to assert additional causes of action not expressly identified by the plaintiff. By way of example, although none of the twenty-nine listed causes of action assert an excessive force claim against defendants Cioffa and Evans, in the body of the complaint, specifically paragraph twenty, plaintiff alleges that defendants Prebalick,

compensatory and punitive damages in the amounts of $200,000 and $100,000, respectively, from each defendant. Dkt. No. 45 at 34.

On May 10, 2014, following service of process and completion of discovery, defendants moved for the entry of partial summary judgment.[14] Dkt. No. 174. In their motion, defendants argue that (1) the damage claims against the defendants in their official capacities are barred by the Eleventh Amendment; (2) plaintiff's verbal harassment claims are not cognizable; (3) plaintiff's deliberate medical indifference claims are deficient based upon his failure to meet either the objective or subjective elements of such a claim; (4) plaintiff's denial of access to the courts cause of action is subject to dismissal for failure to allege specific injury resulting from the loss or misplacement of his legal records; (5) plaintiff's due process claims are legally deficient based upon his failure to establish that he was deprived of a cognizable liberty interest; (6) plaintiff's claims against defendants Amatucci, Artus, Bellnier, Colvin, Fischer, Johnson, Lempke, Rock, Jones, and Wright are subject to dismissal based upon

_____

Cioffa, and Evans used force against him after he fell by slamming him on the ground, picking him up off of the ground, and throwing him into his cell. Dkt. No. 45 at 5.

[14]     There is no indication in the court's records that defendants Whipple, Jones, Basket, or Cusack were served with the summons and complaint or otherwise appeared in the action. For this reason, and as is discussed more completely below in Part III.H. of this report, I recommend that plaintiff's claims against those defendants be dismissed.

lack of personal involvement; and (7) defendants are entitled to qualified immunity from suit with respect to plaintiff's deliberate medical indifference claims. *Id.* Plaintiff has since responded, on May 14, 2014, urging the court to deny defendant's motion in its entirety.[15] [Dkt. No. 179](#).

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine

---

[15] Plaintiff's opposition papers include a response to defendants' statement of material facts not in dispute, submitted pursuant to rule 7.1(a)(3) of the local rules of practice for this court. [Dkt. No. 179](#). That response, however, fails to comply with the governing local rule because it contains only blanket denials of certain of the facts alleged by the defendants not to be controverted. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Each denial [in the non-moving party's response] shall set forth a specific citation to the record where the factual issue arises."). Under these circumstances, where plaintiff was notified both by the court and defendants of the consequences of failing to properly respond to defendants' motion, Dkt. Nos. 174-1, 176, the court could deem those facts that are only subject to a blanket denial to be admitted by the plaintiff. *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn J.) (listing cases); *see also Monahan v. N.Y. City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rule 7.1(a)(3); *Ketchuck v. Boyer*, No. 10-CV-0870, 2011 WL 5080404, at *2 (N.D.N.Y. Oct. 25, 2011) (McAvoy, J.) ("[T]he responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly." (listing cases)).

dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the

nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Eleventh Amendment

Plaintiff's amended complaint recites that the defendants are being sued in both their personal and official capacities. Dkt. No. 45 at 1. In their motion, defendants contend that any damage claims brought against them in their official capacities are precluded by the Eleventh Amendment. Dkt. No. 174-4 at 4-6.

The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Cory v. White*, 457 U.S. 85, 90-91 (1982); *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to

both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest. *See, e.g., Daisernia v. State of N.Y.*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an individual official." (quoting *Edelman*, 415 U.S. at 663)); *see also Richards v. State of N.Y. App. Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (*citing, inter alia, Cory v. White*, 457 U.S. 85, 89-91, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan*, 996 F.2d at 529; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

Plaintiff's damage claims in this action against the named defendants in their official capacities are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia*, 582 F. Supp. at 798-99. Accordingly, I recommend that, to the extent that the damage claims raised in plaintiff's amended complaint are asserted

against any of the named defendants in their official capacities, those claims be dismissed with prejudice.[16]

C.    Claims of Verbal Harassment

Many of the claims set forth in plaintiff's amended complaint appear to be predicated upon allegations of threats and verbal harassment directed toward him by various defendants.[17] To the extent those threats and comments may form the basis for any of plaintiff's claims, defendants seek dismissal of those claims. Dkt. No. 174-4 at 7. In response to defendants' motion, plaintiff argues that he is not asserting any cause of action based solely on verbal harassment, threats, or abuse. Dkt. No. 179-1 at 5. Because it is well-established that claims of verbal abuse or harassment, standing alone, are not cognizable under 42 U.S.C. § 1983, I recommend that plaintiff's claims of verbal harassment, to the extent the

---

[16]    Plaintiff's complaint requests only monetary relief, and specifically does not seek declaratory or injunctive relief.

[17]    Some of the specific allegations set forth in the amended complaint regarding verbal harassment include the following: (1) defendant Bower told plaintiff he would be sexually harassed if he continued writing grievances, Dkt. No. 45. at 4; (2) defendant Prebalick told plaintiff that he was making things harder on himself by writing grievances, made a derogatory statement regarding his hair, and spread rumors throughout the prison that he was a child molester, *id.* at 5, 9-10; (3) defendant Maynard threatened to "beat [plaintiff] up" if he did not provide requested information, *id* at 7; (4) defendant Carlee used profane language toward plaintiff, *id.* at 8; (5) defendant Holmes threatened to issue a misbehavior report to plaintiff if he requested sick call for non-emergency purposes, *id.* at 15; and (6) defendant Atkinson told the plaintiff that he would receive minimal to no medical care, *id.* at 23.

amended complaint is construed as asserting them, be dismissed. *See, e.g., Jermosen v. Coughlin*, 878 F. Supp. 444, 449 (N.D.N.Y. 1995) (McAvoy, J.) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under [section] 1983." (citing cases)).

  D. <u>Procedural Due Process</u>

  Defendants next seek dismissal of plaintiff's procedural due process causes of action. [Dkt. No. 174-4 at 17-18](). To establish a claim under 42 U.S.C. § 1983 for the denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 260 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). While defendants' motion does not address plaintiff's allegations concerning the specific procedural rights that are alleged to have been denied him during the two disciplinary hearings at issue, they contend that, as a threshold

matter, plaintiff cannot establish that he possessed and was denied a constitutionally significant interest.[18]

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary

---

[18] The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). Specifically, under *Wolff*, the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell*, 418 U.S. 539, 564-69 (1974); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487-88. In addition, the due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to. . . an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. at 570-71).

confinement, thus satisfying the first *Sandin* factor. *See*, *e.g.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, to avoid the entry of summary judgment, plaintiff must have proffered evidence from which a reasonable factfinder could conclude that the conditions of his disciplinary confinement rose to the level of an atypical and significant hardship under *Sandin.*[19] *See, e.g., Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) ("[W]here the nonmoving party bears the burden of proof at trial. . . it is [his] burden to come forward to demonstrate that there are issues that must be decided by the factfinder because they may reasonably be decided in favor of either party." (citations omitted)).

Atypicality in a *Sandin* inquiry is normally a question of law.[20] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). When analyzing the conditions of an inmate's disciplinary confinement, the relevant factors for consideration

---

[19]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[20]     In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

include "'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed[.]'" *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir.1998)). As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133 (citing *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000)). Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.'" *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir.1999)). On the other hand, the Second Circuit has suggested that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient

departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

The Second Circuit has stated that disputes regarding the conditions of a plaintiff's confinement may not be resolved on summary judgment. *Davis*, 576 F.3d at 134 (quoting *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004). "Only when the conditions are uncontested may a district court resolve the issue of a typicality of confinement as a matter of law." *Id.*

In this instance, plaintiff's amended complaint, at a minimum, raises a genuine dispute of fact regarding whether he was deprived of a cognizable liberty interest in connection with the two disciplinary hearings at issue. While there is no record evidence disclosing the amount of time he actually spent in disciplinary SHU confinement, the April 26, 2008 hearing resulted in a sanction that included 180 days of SHU confinement, with no indication that the sanction was ever reversed.[21] Dkt. No. 45 at 13.

---

[21]     Plaintiff's amended complaint also alleges that, as a result of the determination from the disciplinary hearing on April 26, 2008, defendant Cunningham, the hearing officer, recommended that plaintiff lose good time credits. Dkt. No. 45 at 13. Because there is no record evidence to suggest that the determination was reversed, it is not clear that plaintiff's due process claim is viable absent a waiver, pursuant to *Peralta v. Vasquez*, 467 F.3d 98 (2d Cir. 2006), relinquishing any claims affecting the length of his confinement, including the loss of good time credits associated with the disciplinary hearing on April 26, 2008. Because defendants have not addressed this in their motion, however, plaintiff was not on notice of this issue and, consequently, not provided an opportunity to respond. Accordingly, I make no any finding with respect to whether plaintiff must first relinquish any claims affecting the length of his sentence before proceeding with his due process claim regarding the hearing on April 26, 2008.

The disciplinary hearing conducted by defendant Ramus on February 2, 2010, resulted in a penalty that included ten months of disciplinary SHU confinement. Dkt. No. 45 at 14. While the record, once again, does not disclose how much time plaintiff actually served in the SHU as a result of the sanction, defendant Ramus' determination was administratively reversed on October 28, 2010, nearly nine months after the conclusion of the hearing. *Id.* Under these circumstances, when drawing all inferences and resolving any ambiguities in plaintiff's favor, it appears that both of the hearings at issue resulted in SHU confinement of more than 180 days. A genuine dispute of material fact therefore exists with respect to whether plaintiff suffered the deprivation of a constitutionally significant liberty interest as a result of those two hearings, thereby precluding the entry of summary judgment dismissing plaintiff's due process claims.[22] *See*

---

[22]    In addition, in plaintiff's opposition to defendants' motion for summary judgment, he contends that, as a result of the disciplinary SHU confinement, he

> lost amenity in his living conditions, being confined 23 hhours [sic] a day, deprived of his personal property, the liberty to attend threaputic [sic] programs, work, attend out door [sic] recreation in a congreated [sic] setting with the ability to engage in recreational activities, attend religious services and family celebration, attend religious services as well [as] access the law library and unable to participate in the family reunion programs.

Dkt. No. 179-1 at 23. These allegations, which describe the specific conditions of plaintiff's SHU confinement, only bolster those contained in plaintiff's amended complaint regarding whether plaintiff was deprived a sufficient liberty interest under

*Kalwasinski v. Morse*, 201 F.3d 103, 106-08 (2d Cir. 1999) (finding that

SHU confinement for 180 days may impose an atypical and significant

hardship); *accord, Johnson v. Fernandez*, No. 09-CV-0626, 2011 WL

7629513, at *8 (N.D.N.Y. Mar. 1, 2011) (Baxter, M.J.), *report and

recommendation adopted by* 2012 WL 1033652 (N.D.N.Y. Mar. 27, 2012)

(Scullin, J.). For that reason, I recommend defendants' motion concerning

plaintiff's due process claims be denied.

    E.    <u>Personal Involvement</u>

In their motion, defendants contend that several of them, including

defendants Amatucci, Artus, Bellnier, Colvin, Fischer, Johnson, Lempke,

Rock, Sgt. Jones, and Wright, are subject to dismissal in this action

because they had no personal involvement in any of the constitutional

deprivations alleged in plaintiff's amended complaint. Dkt. No. 174-4 at 18-

19.

"Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under [section]

---

*Sandin*, and defendants have not challenged them by way of a reply to plaintiff's opposition to the pending motion. Although the allegations are contained in plaintiff's unsworn memorandum of law in support of his opposition, courts in this circuit routinely consider such statements in connection with a motion for summary judgment where the proponent of the statements is a *pro se* litigant, mindful of the duty to extend special solicitude to those individuals. *See, e.g., Riehl v. Martin*, No. 13-CV-0439, 2014 WL 1289601, at *6 (N.D.N.Y Mar. 31, 2014) (Sharpe, J., *adopting report and recommendation by* Dancks, M.J.) (citing cases).

1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

Certain of the defendants implicated in this portion of the pending motion served in supervisory roles, including, though not limited to, defendants Fischer, Wright, Lempke, Artus, Rock, and Bellnier. It is well-established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a

supervisory official for a civil rights violation, a plaintiff must demonstrate

that the individual (1) directly participated in the challenged conduct; (2)

after learning of the violation through a report or appeal, failed to remedy

the wrong; (3) created or allowed to continue a policy or custom under

which unconstitutional practices occurred; (4) was grossly negligent in

managing the subordinates who caused the unlawful event; or (5) failed to

act on information indicating that unconstitutional acts were occurring.

*Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other*

*grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009); *see also*

*Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.

1995); *Wright*, 21 F.3d at 501. Below, I have addressed the personal

involvement of each of the defendants implicated in defendants' motion.

       1.    <u>Defendant Amatucci</u>[23]

Plaintiff has asserted a deliberate medical indifference claim against

defendant Amatucci, who is referenced in only three paragraphs of

plaintiff's amended complaint, recited below. Dkt. No. 45 at 19, 26, 31.

        78.   My health care provider was able to get
        approval for the urology nasal medication that was

---

[23]     The correct spelling of this individual's name is unknown. Plaintiff's amended complaint refers to him as "Anuntic," "Annutice," "Annutcie," and "Annuci." Dkt. No. 45 at 1, 19, 26, 31. In their motion, defendants refer to this individual as "Amatucci." Dkt. No. 174-4 at 18. In his response to the defendants' motion, plaintiff also refers to this individual as "Amatucci." Dkt. No. 179-1 at 23. Because the parties apparently agree on this last spelling, I have adopted it for purposes of this report and recommendation.

initially denied by defendant Annuci (sic) who prescribed a treatment that was inconsistent with my urology problem. I was also prescribed a more effective pain medication in September 2009, and when I was move[d] to Down State C.F., on or about 10/9/09, where I stayed until 10/13/09, I was denied my asthma, migraine and pain medications as well [as] urology medication. I experienced breathing complaications [sic] as well [as] urology and left in excruciating pain for several days. I made numerous request[s] for medical treatment from the officers (john does) and was denied.

103.  A consultation form was submitted for plaintiff to receive a new ACL knee brace as well [as] the urology medication (Nasal Spray) by N.P. Lashway, who informed me that defendant Annutice (sic) denied the urology medication and ordered an alarm clock that had nothing to do with my urology problems and the ACL brace was denied as well. Defendant Annutcie (sic) never spoke to, saw or examined me and denied me medical care. I forward Annutcie (sic) a letter dated 6/12/09, informing him that the treatment he (Annutcie) ordered had nothing to do with my urology problems explaining that I was not receiving adequate, meaningful, and effective medical care for my chronic lower back pain, migraine headaches, and I requested the reason as to why the request for a new ACL brace was denied. Plaintiff never received a response form [sic] Annutcie (sic). Moreover, plaintiff was never examined by Dr. Johnson or N.P. Lashway.

## TWENTIETH CAUSE OF ACTION

The actions/inactions of defendants Dr. Weissman, Dr. Weinstock, Dr. Johnson, Dr. Hawthorne, N.P. Lashway, N.P. Parmer, N.A. Smith, N.A. Clemans, Dr. Annutcie (sic), R.N. Fairchild, R.N. Chesbrough, R.N. Holmes, and R.N. Atkinson, acting alone

and/or in conjunction with each other, did aggravate plaintiff's medical conditions (Lower back pain & Spasms, right wrist, elbow & shoulder pain & numbness migraine headaches, light hurting eyes, blurry double vision, right knee ins[t]ability swelling & pain, asthma condition) and were deliberately indifferent to plaintiff's medical needs by practicing a custom of providing low ineffective standard of care less efficacious treatment, causing plaintiff needless suffering.

*Id.*

Liberally construing these allegations, I find they suffice to give rise to a genuine dispute of material fact regarding whether defendant Amatucci was personally involved in the deliberate medical indifference claim asserted by plaintiff. Plaintiff alleges that defendant Amatucci denied him medication, did not examine him, and failed to remedy the continuing problems once he learned of them through a letter from plaintiff dated June 12, 2009. Accordingly, I recommend defendants' motion be denied with respect to the personal involvement of defendant Amatucci.

2.      <u>Defendant Artus</u>

As was described above in Part II. of this report, plaintiff has asserted deliberate medical indifference and free exercise and RLUIPA claims against defendant Artus based on his role as the superintendent in one of the facilities in which plaintiff was confined at the relevant times. His amended complaint references defendant Artus in eleven paragraphs,

including paragraphs numbered 3, 31, 104, 105, 108, and 109, as well as the fifth, sixteenth, seventeenth, twenty-eighth, and twenty-ninth identified causes of action. Dkt. No. 45 at 2, 7-8, 27, 28, 29, 31, 33.

With respect to plaintiff's free exercise and RLUIPA claims, he alleges that, between October and December 2009, he verbally notified defendant Artus in person that he was regularly being denied access to religious services and his dreadlocks were being pulled out by corrections officers. Dkt. No. 45 at 7-8. Plaintiff contends that defendant Artus responded by advising plaintiff he would look into the matters and report his findings, but plaintiff "never heard anything" in response. *Id.* at 8. Similarly, plaintiff complained directly to defendant Artus while he was making rounds at the prison facility about being denied medical care and his need to not be "housed on a company where [he] ha[s] to walk up and down numerous stairs" due to his physical impairments. *Id.* at 27. According to plaintiff, defendant Artus "took no corrective actions to ensure that [he] received meaningful, adequate, and effective medical care." *Id.* These allegations, which form the basis of plaintiff's claims against defendant Artus, are sufficient under *Colon*, if proven, to establish personal involvement.

### 3. Defendant Bellnier[24]

Like defendant Artus, plaintiff has asserted deliberate medical indifference, as well as free religious exercise and RULIPA claims against defendant Bellnier in his capacity as a supervisor. Defendant Bellnier is the subject of allegations contained in paragraphs numbered 3, 25, 72, 104, 108, and 109, as well as the fourth, twenty-eighth, and twenty-ninth causes of action identified in the amended complaint. Dkt. No. 45 at 6, 18, 27, 28, 29, 33. Only paragraph 72 sets forth non-conclusory allegations regarding plaintiff's claim of deliberate medical indifference asserted against defendant Bellnier. In that paragraph, plaintiff contends that, on several occasions while defendant Bellnier was making rounds at the prison facility, Shepherd directly informed defendant Bellnier that he was being denied adequate medical care. *Id.* at 18. Plaintiff alleges that the Legal Aid Society also alerted Bellnier concerning his inadequate medical treatment. *Id.* These allegations are sufficient to give rise to a dispute of fact regarding whether defendant Bellnier deprived plaintiff adequate medical care in his capacity as a supervisor.

---

[24] The correct spelling of this individual's name is unknown. Plaintiff's amended complaint refers to him as "Bellinier," "Bellinuer," "Bellniuer," "Bellnuer," and "Bellinner." Dkt. No. 45 at 1, 2, 6, 8, 18, 27, 29, 33. In their motion, defendants refer to this individual as "Bellnier." Dkt. No. 174-4 at 18. In his response to the pending motion, plaintiff also refers to this individual as "Bellnier" and "Belliner." Dkt. No. 179-1 at 23. Because the parties apparently agree on "Bellnier," I have adopted it for purposes of this report and recommendation.

Otherwise, plaintiff's amended complaint sets forth only vague and conclusory allegations intending to implicate defendant Bellnier in his free exercise and RULIPA claims. By way of example, plaintiff alleges that, "[o]n or about 10/07/08, there was a Negust Religious celebration where a religious meal is served. I never received my religious meal and when defendant Bellinuer (sic) made his rounds, I made him aware that I never received my religious meal. Bellinuer (sic) advised me that the matter would be looked into." Dkt. No. 45 at 6. Even liberally construed, however, this is insufficient to establish the personal involvement of defendant Bellnier in the conduct forming the basis for plaintiff's free exercise and RLUIPA claims because plaintiff does not contend that defendant Bellnier failed to remedy plaintiff's problem. Moreover, there is nothing in the record evidence to suggest that, with respect to plaintiff's religious deprivation claims, defendant Bellnier ignored any of plaintiff's complaints. Accordingly, I recommend that the defendants' motion be granted with respect to the personal involvement of defendant Bellnier in plaintiff's free exercise and RLUIPA claims.

4.   Defendant Colvin

Plaintiff has asserted six claims against defendant Colvin, the deputy superintendent of security at one of the prisons in which plaintiff was held at the relevant times, including (1) deliberate medical indifference, (2) retaliation, (3), denial of access to courts, (4) excessive force, (5) deprivation of his rights to free exercise and under the RLUIPA, and (6) failure to protect plaintiff from harm. Defendant Colvin is sued based on his capacity as a supervisor in connection with the deliberate medical indifference, retaliation, denial of access to courts, excessive force, and free exercise and RLUIPA claims. Plaintiff's amended complaint references defendant Colvin in paragraphs numbered 4, 49, 86, 105, and 108, as well as the seventh and sixteenth causes of action listed in plaintiff's amended complaint. Dkt. No. 45 at 2, 11, 21-22, 27-28, 29, 31. Only paragraph 86 sets forth sufficient allegations to establish personal involvement in some, but not all, of the claims asserted against defendant Colvin. In particular, plaintiff alleges that "[d]efendant Lempke and Colvin were informed by plaintiff numerous times when they were making their rounds in 'SHU', [sic] that [he] was being denied effective, adequate medical care, and sexually assaulted, religious discrimination, harassment, and retaliation due to [his] filing grievances and complaints

against officials, requesting action be taken against the officials who committed the violations, and . . . [n]othing was done by defendant Lempke and Colvin to refrain their subordinates from violating his rights[.]" *Id.* at 21-22. Because this allegation suggests defendant Colvin knew about the alleged continuing inadequate medical care, sexual harassment, religious discrimination, and retaliation but did nothing to address those concerns, I find there exists a dispute of fact with respect to the personal involvement of that defendant in connection with plaintiff's claims of deliberate medical indifference, excessive force, free exercise and RLUIPA, and retaliation claims.

Similarly, plaintiff alleges that he informed defendant Colvin regarding his missing legal paperwork, but that Colvin did nothing to help plaintiff. Dkt. No. 45 at 11. This is sufficient to implicate Colvin in plaintiff's denial of access to the courts cause of action.

Turning now to the failure to protect claim asserted against Colvin, the only allegation in the plaintiff's complaint related to this cause of action states, "Defendants C.O. Whipple, superintendent Lempke, Sgt. Barber, Colvin, C.O. Bower as well as unidentified officials, failed to stop their subordinates from sexually molesting/assaulting and harassing plaintiff as well [as] failing to ensure their subordinates were properly and adequately

trained in pat frisk procedures." Dkt. No. 45 at 29. This type of vague and conclusory allegation, however, is not sufficient to satisfy the personal involvement requirement of a section 1983 claim. Moreover, there is nothing in the record, aside from this allegation, to suggest that defendant Colvin failed to protect plaintiff from any use of force. Accordingly, I recommend that defendants' motion be granted to the extent it seeks dismissal of plaintiff's failure to protect claim asserted against defendant Colvin.

### 5.   Defendant Fischer

Plaintiff asserts the following claims against defendant Fischer based on his capacity as a supervisor: (1) excessive force, (2) deprivation of due process, (3) deliberate medical indifference, and (4) free exercise and RLUIPA violations. Defendant Fischer is mentioned throughout the amended complaint, including in paragraphs numbered 2, 27, 98, 99, 100, 101, 105, 107, 108, and 109, as well as in the sixteenth, seventeenth, twenty-eighth, and twenty-ninth identified causes of action. Dkt. No. 45 at 2, 6, 25, 26, 27, 28, 30, 31, 33. Plaintiff's claim asserting a due process violation against defendant Fischer arises from the allegation that, although plaintiff appealed the disciplinary determinations by defendants Cunningham and Ramus to defendant Fischer based on the alleged due

process violations, Fischer affirmed the determinations. Merely affirming the denial of an inmate's appeal of a disciplinary sanction, however, is insufficient, on its own, to establish personal involvement. *Long v. Crowley*, No. 09-CV-0456, 2010 WL 5129102, at *1 (W.D.N.Y. Dec. 10, 2010); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 383 (N.D.N.Y. 2010) (Suddaby, J.). Plaintiff's allegations regarding the other causes of action asserted against defendant Fischer either appear to assert a non-cognizable constitutional claim or are vague and conclusory. *See, e.g.,* Dkt. No. 45 at 25 ("Supervisor Bellamy and defendant Fischer were aware of the systematic gross deficiecious [sic] and inadequate training and supervision of the inmate grievance program, for other prisoners also had problems with their grievances being filed and processed for many prisoners complained to the grievance supervisor as well as the superintendents and defendant Fischer, and nothing was done to ensure that my grievance filing process was not hindered, no corrective measures were taken."), 31 ("Defendants Artus, Lempke and Fischer, acting alone and/or in conjunction with each other were aware of there being a systematic, gross inadequacies in training as well [as] supervision of subordinates in the use of force, and further failed to take corrective as well as preventative measures, which caused the violation of plaintiff's

rights."). Accordingly, I recommend that defendants' motion for summary judgment based on the lack of personal involvement of defendant Fischer be granted.

### 6. Defendant Johnson

Plaintiff asserts only a deliberate medical indifference claim against defendant Johnson. Liberally construed, the claim is asserted against Johnson based both on her direct involvement in treating plaintiff, as well as based on her role as supervisor. Plaintiff's amended complaint references defendant Johnson in paragraphs numbered 76, 80, 102, 103, 106, and 108, as well as the nineteenth and twentieth identified causes of action. Dkt. No. 45 at 19, 20, 26, 27, 31. The allegations regarding the treatment received by defendant Johnson are sufficient to give rise to a dispute of material fact as to whether she was personally involved in the alleged deliberate medical indifference. Dkt. No. 45 at 19, 20. The allegations giving rise to the claim based on defendant Johnson's role as a supervisor, however, are vague and conclusory, *id.* at 26, 31, and no reasonable factfinder could conclude, based on the record, that defendant Johnson was personally involved in her role as a supervisor under *Colon*. Accordingly, I recommend that defendants' motion based on the personal involvement of defendant Johnson be granted with respect to the

deliberate medical indifference claim asserted against that defendant based on her role as a supervisor.

## 7. Defendant Lempke

Plaintiff asserts six claims against defendant Lempke, including (1) deliberate medical indifference, (2) retaliation, (3) violation of his free exercise and RLUIPA rights, (4) denial of access to the courts,(5) failure to protect plaintiff from harm, and (6) excessive force. Plaintiff asserts the deliberate medical indifference, retaliation, free exercise and RLUIPA, and denial of court access causes of action based on defendant Lempke's capacity as a supervisor. The amended complaint references defendant Lempke in paragraphs numbered 3, 49, 86, 104, 105, 108, and 109, as well as in the fourth, seventh, sixteenth, seventeenth, twenty-eighth, and twenty-ninth identified causes of action. Dkt. No. 45 at 2, 11, 21-22, 27-8, 29, 31, 33.

Plaintiff's allegations giving rise to the denial of access to courts claim is sufficient to implicate defendant Lempke. Specifically, plaintiff alleges that he directly informed defendant Lempke that some of his legal paperwork became misplaced, but that Lempke did nothing to help plaintiff. Dkt. No. 45 at 11. Under *Colon*, this is enough to raise a dispute

of fact regarding defendant Lempke's personal involvement in the denial of access to courts cause of action.

Similarly, the allegation that defendant Lempke did nothing to help plaintiff after he learned that plaintiff was continuously being denied adequate medical care, sexually assaulted, discriminated based on his religion, and retaliated against for filing grievances is sufficient to establish personal involvement in light of the record evidence. Dkt. No. 45 at 21-22.

As for the failure to protect claim, the only allegation in the amended complaint related to this cause of action states, "Defendants C.O. Whipple, superintendent Lempke, Sgt. Barber, Colvin, C.O. Bower as well as unidentified officials, failed to stop their subordinates from sexually molesting/assaulting and harassing plaintiff as well [as] failing to ensure their subordinates were properly and adequately trained in pat frisk procedures." Dkt. No. 45 at 29. This type of vague and conclusory allegation, however, is not sufficient to satisfy the personal involvement requirement of a section 1983 claim. Moreover, there is nothing in the record, aside from this allegation, to suggest that defendant Lempke failed to protect plaintiff from any use of force. Accordingly, I recommend that defendants' motion be granted to the extent it seeks dismissal of plaintiff's failure to protect claim asserted against defendant Lempke.

### 8. Sgt. Jones

As was noted above, plaintiff asserts a deliberate medical indifference and failure to protect claim against defendant Sgt. Jones. With respect to the first cause of action, plaintiff alleges as follows:

> On or about 6/27/10, plaintiff was moved to UpState C.F., before leaving Five Points and being placed on a bus, he spoke to defendant Sgt. Jones, requesting that his ACL right knee brace be returned to him, requesting the medical department be called, since it was medical who had my original ACL knee brace, I requested my back brace be returned and Sgt. Jones stated that, he was not calling medical for any brace.

Dkt. No. 45 at 22. This allegation is sufficient to give rise to a dispute of material fact regarding whether defendant Sgt. Jones was personally involved in denying plaintiff adequate medical care.

Turning to plaintiff's allegation that defendant Sgt. Jones failed to protect him from harm, plaintiff alleges that, during the assault by defendants Prebalick, Cioffa, and Evans on or about May 6, 2010, defendant Sgt. Jones witnessed the incident and "did nothing to intervene or refrain his officers from assaulting [him]." Dkt. No. 45 at 5. This is sufficient to establish defendant Sgt. Jones' personal involvement in the alleged assault.

Accordingly, I recommend that defendants' motion be denied with respect to defendant Sgt Jones' personal involvement in the claims asserted against him.

### 9. Defendant Rock

Plaintiff asserts two claims against defendant Rock, alleging a violation of his free exercise and RULIPA rights and deliberate medical indifference. Both of these causes of action are asserted against defendant Rock based on his role as a supervisor. The amended complaint references defendant Rock in paragraphs numbered 31, 40, 73, 104, 108, and 109, as well as in the fourth cause of action. Dkt. No. 45 at 2, 9, 18, 27, 28, 29.

With respect to the free exercise and RULIPA claim, plaintiff contends that he informed defendant Rock about not receiving a single missed religious meal on or about October 7, 2010, and that Rock did not take any steps to remedy the issue. Dkt. No. 45 at 9. It is well settled that this type of allegation regarding a past constitutional violation is not sufficient to establish defendant Rock's personal involvement based on his role as a supervisor. *See Platt v. Inc. Vill. Southampton*, 391 F. A'ppx 62, 65 (2d Cir. 2010) ("[A]n allegation that a supervisory official ignored a letter protesting past unconstitutional conduct is, without more, [insufficient] to

state a claim that the official was 'personally involved' in the unconstitutional conduct."). Plaintiff further alleges, however, that defendant Rock was notified on several occasions of ongoing violations regarding the denial of adequate medical care. Dkt. No. 45 at 18. Such an allegation, if proven, could suffice to establish liability on the part of defendant Rock. Accordingly, I recommend that defendants' motion be granted with respect to plaintiff's free exercise and RLUIPA claim against defendant Rock, but otherwise be denied.

        10.    Defendant Wright

        Plaintiff has asserted a deliberate medical indifference claim against defendant Wright based on his role as the DOCCS Deputy Commissioner. Defendant Wright is referenced in paragraphs numbered 6, 100, 101, and 108, as well as the twenty-eighth and twenty-ninth causes of action identified in the amended complaint. Dkt. No. 45 at 3, 26, 27, 33. Plaintiff alleges that he notified defendant Wright of the continuing denial of adequate medical care through "numerous complaints written from 2008, through 2010[.]" *Id.* at 26. In response, defendant Wright referred the matter to "his subordinates," who, plaintiff alleges, "did nothing more than advise [him] that the division of health services conducted an investigation[], and suggested that [he] continue to bring [his] medical

concerns to the attention of the health care staff[.]" *Id.* Without more, these contentions do not establish defendant Wright's personal involvement in plaintiff's deliberate medical indifference cause of action. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (affirming the district court's grant of summary judgment where the defendant-commissioner referred the plaintiff's letter to the prison superintendent); *accord, Grullon v. City of New Haven*, 720 F.3d 133, 140-41 (2d Cir. 2013). Similarly, plaintiff's other allegations, as well as the record evidence as a whole, do not reflect the personal involvement of defendant Wright in plaintiff's alleged inadequate medical care. Accordingly, I recommend defendants' motion with respect to defendant Wright be granted.

F.     Denial of Access to the Courts

In their motion, defendants also seek dismissal of plaintiff's denial of access to the courts cause of action. Dkt. No. 174-4 at 16-17. Defendants contend that plaintiff has failed to establish either that he suffered any prejudice from the loss of his legal materials or the personal involvement of the defendants alleged to be responsible for the loss of his materials. *Id.*

It is well-established that prison inmates have a constitutional right to meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 824 (1977); *accord*, *Lewis v. Casey*, 518 U.S. 343, 350 (1996) ("The right that

*Bounds* acknowledged was the (already well-established) right of *access to the courts*." (emphasis in original)). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents, or file them[.]" *Lewis*, 518 U.S. at 350 (citations omitted). A plaintiff asserting a denial of access to courts claim must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (quotation marks omitted). To establish a denial of access to courts claim, a plaintiff must satisfy two elements. First, he must show that the defendant acted deliberately and maliciously. *Davis*, 320 F.3d at 351. Second, plaintiff must demonstrate that he suffered an actual injury. *Id.*

    In this instance, plaintiff has failed to adduce any evidence that defendant Prebalick was personally involved in the alleged loss of his legal papers. Personal involvement in the context of the court access claim, as with any other constitutional deprivation, is a prerequisite to the finding of liability. *See Livingston v. Escrow*, 08-CV-6576, 2013 WL 5603870, at *6 (W.D.N.Y. Oct. 11, 2013) (dismissing the plaintiff's court access claim on summary judgment because the plaintiff had failed to establish the personal involvement of the defendant). Plaintiff alleges that, with respect to the incident in or about February 2010 regarding his missing papers, he

informed defendant Prebalick "of the missing legal documents," and Prebalick responded by telling plaintiff "it would be hard for [him] to sue officers without legal documents, and plaintiff's law suit [sic] was in the garbage, along with his other documents." Dkt. No. 45 at 11. Even liberally construed, this allegation does not suggest that defendant Prebalick was responsible for discarding or otherwise losing plaintiff's legal papers. In his response to the pending motion, plaintiff admits that defendant Prebalick was only present when plaintiff was returned his property, and he does not contend that Prebalick was involved in the papers being misplaced in the first instance. Accordingly, I recommend dismissal of this claim against defendant Prebalick.

Turning to defendants Lempke and Colvin, plaintiff alleges that he informed those individuals that his legal papers were missing after the first incident in December 2009. Dkt. No. 45 at 11. Plaintiff contends that defendants Lempke and Colvin failed to address his complaints, but there is nothing in the record to suggest that they deliberately or maliciously ignored plaintiff. Instead, plaintiff merely states that he "requested Colvin and Lempke return the missing legal documents" and certain documents were never returned to him. *Id.*; *see also* Dkt. No. 179-1 at 21-22. Without more, the court determines that no reasonable factfinder could conclude

that defendants Lempke and Colvin acted deliberately or maliciously in addressing plaintiff's complaint. Accordingly, I recommend dismissal of this claim against those individuals.

### G.   Deliberate Medical Indifference

A significant portion of plaintiff's amended complaint is dedicated to his complaints regarding the treatment he received for his medical conditions at the various prison facilities in which he was confined. In their motion, defendants contend plaintiff's medical records reveal that he consistently received extensive and proper care and treatment for his various conditions, and that plaintiff's medical indifference claim does not satisfy either the objective or subjective requirements for proving such cause of action under the Eighth Amendment.[25] Dkt. No. 174-4 at 7-14.

---

[25]    Defendants specifically seek dismissal of plaintiff's deliberate medical indifference claim as against defendants Atkinson, Bellnier, Chesbrough, Clemons, Colvin, Fairchild, Fischer, Holmes, Johnson, Lempke, Parmer, Perez, Prebalick, Rock, Roew, Smith, Thomas, Weinstock, and Weissman. Dkt. No. 174-4 at 7. As was noted above in Part II. of this report, the court has construed plaintiff's amended complaint as asserting a deliberate medical indifference claim against all of the individuals identified by defendants in their motion, plus defendants Lashaway, Cusack, Sgt. Jones, Hawthorne, Wright, Amatucci, and Artus. In Part III.E., above, the court concluded that the record evidence does not disclose a genuine dispute of material fact regarding whether defendants Fischer and Wright were personally involved in the alleged inadequate treatment received by plaintiff. For this reason, I have not analyzed the merits of that claim as it relates to defendants Fischer and Wright. In addition, because defendants do not seek dismissal of the deliberate medical indifference claim asserted against defendants Lashaway, Cusack, Sgt. Jones, Hawthorne, Amatucci, and Artus, I have not analyzed the merits of that claim to the extent it is asserted against those individuals.

1. <u>Legal Standard</u>

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or which 'involve the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356

(E.D.N.Y. 2010). To satisfy the objective requirement, the Second Circuit

has said that

> [d]etermining whether a deprivation is an objectively
> serious deprivation entails two inquiries. The first inquiry
> is whether the prisoner was actually deprived of
> adequate medical care. As the Supreme Court has
> noted, the prison official's duty is only to provide
> reasonable medical care . . . . Second, the objective test
> asks whether the inadequacy in medical care is
> sufficiently serious. This inquiry requires the court to
> examine how the offending conduct is inadequate and
> what harm, if any, the inadequacy has caused or will
> likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations

omitted).

The second inquiry of the objective test requires a court to look at

the seriousness of the inmate's medical condition if the plaintiff alleges a

complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178,

185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical

condition include whether a reasonable doctor or patient would find it

important and worthy of comment, whether the condition significantly

affects an individual's daily activities, and whether it causes chronic and

substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and

alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment

was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 837); *see also Leach v. Dufrain*, 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct.

1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.).

"Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

2.   Analysis

i.   Defendants Bellnier, Clemons, Colvin, Johnson, Lempke, Parmer, Perez, Prebalick, Rock, Roew, Smith, Thomas, Weinstock, and Weissman

After carefully reviewing the record evidence, the court determines that no reasonable factfinder could conclude that defendants Bellnier, Clemons, Colvin, Johnson, Lempke, Parmer, Perez, Prebalick, Rock, Roew, Smith, Thomas, Weinstock, and Weissman acted with the requisite mental state while treating plaintiff to satisfy the subjective element of a deliberate indifference cause of action. Plaintiff's amended complaint does not allege that these defendants acted maliciously or sadistically with respect to their treatment or care of him. *See generally* Dkt. No. 45. Plaintiff alleges that defendants Johnson, Weissman, and Weinstock "knowingly provided me with less effciacious [sic] and effective medical care as well [as] providing a low standard of health care as this were the defendants named herein custom and practice." *Id.* at 26. Similarly, in the eighteenth identified cause of action, plaintiff contends that defendant

Weissman "knowingly and intentionally" discontinued certain medications. *Id.* at 31. Even assuming that "knowingly" or "intentionally" suffices to satisfy the mental state required in an Eighth Amendment deliberate medical indifference claim, those allegations are vague and conclusory, and plaintiff has not adduced any additional evidence to support them. Similarly, plaintiff's allegation that defendants Parmer, Johnson, and Weissman "falsified [his] medical records with malicious intent of providing a lower standard of care for [his] chronic . . . back pain" is conclusory and does not give rise to a genuine dispute of fact regarding those defendants' mental states in connection with the treatment they provided plaintiff.[26] *Id.* at 27. In addressing this element of his claim in his opposition to the defendants' motion, plaintiff states that "[t]he record of competent evidence establishes that plaintiff suffered from callous, wanton deprivation of medical services." Dkt. No. 179-1 at 18. Fatally, however, plaintiff points to no record evidence to support this contention. Accordingly, because no reasonable factfinder could conclude, based on the record now before the court, that any of the above-listed defendants acted maliciously or

---

[26] To the extent plaintiff intends to assert a separate cause of action for the alleged falsification of his medical records, in his decision and order issued on May 11, 2011, Judge McAvoy advised plaintiff that "a claim that medical records were falsified does not state a constitutional violation." Dkt. No. 5 at 14 n.5. Accordingly, insofar as plaintiff's amended complaint is construed as asserting an independent claim for falsifying medical records, I recommend it be dismissed.

sadistically with deliberate indifference to plaintiff's health and safety, I recommend plaintiff's deliberate medical indifference claim be dismissed as against those individuals.

### ii. Defendants Atkinson, Chesbrough, Fairchild, and Holmes

Turning now to defendants Atkinson, Chesbrough, Fairchild, and Holmes, I find there is sufficient record evidence to give rise to a genuine dispute of fact with respect to whether those individuals acted maliciously and sadistically for the purpose of causing harm to plaintiff because he contends that these individuals provided him with inadequate care in retaliation for him filing grievances against them. *See, e.g.,* Dkt. No. 45 at 24, 32. Thus, I now turn my attention to whether a reasonable factfinder could conclude defendants Atkinson, Chesbrough, Fairchild, and Holmes provided plaintiff with objectively inadequate care under the Eighth Amendment.

### a. Defendant Atkinson

Plaintiff's contentions with respect to defendant Atkinson are non-specific. He alleges that defendant Atkinson returned plaintiff to his cell on August 17, 2010, without first permitting Shepherd to see his healthcare provider, defendant Parmer. Dkt. No. 45 at 23. Plaintiff does not, however, explain his reasons for needing to see defendant Parmer at that particular

time, nor does he provide any indication that he was suffering from a sufficiently serious condition requiring treatment from defendant Parmer directly. *Id.*

Similarly, plaintiff contends that, on one occasion, defendant Atkinson came to plaintiff's cell to take his vital signs and directed him to "put [his] arm through the slot" to facilitate the process. Dkt. No. 45 at 23. Plaintiff alleges that, although he explained to defendant Atkinson that placing his arm in the slot causes him pain and back spasms because it requires him to bend over, Atkinson required him to comply with the order. *Id.* Plaintiff neglects to allege, and the record does not reflect, however, that he suffered any injury as a result of complying with defendant Atkinson's order, or that plaintiff, in fact, suffered pain or back spasms as a result of the incident. *Id.*

Finally, plaintiff generally contends that defendant Atkinson (1) denied him medical care "[n]umerous times from August 2010, until November 2010"; (2) aggravated his medical conditions; (3) permitted corrections officers to overhear his confidential medical complaints; (4) failed to document his complaints; (5) denied him access to his healthcare provider; and (6) falsified his medical records. Dkt. No. 45 at 31; Dkt. No. 179-1 at 11-12; Dkt. No. 179-2 at 46. Plaintiff fails, however, to adduce

any evidentiary support for these allegations. Without more, the bare contentions are not sufficient to give rise to a dispute of material fact with respect to whether defendant Atkinson provided plaintiff inadequate medical care in violation of the Eighth Amendment. Accordingly, I recommend that defendants' motion be granted insofar as it seeks dismissal of the deliberate medical indifference claim against defendant Atkinson.

### b.  Defendant Chesbrough

Plaintiff accuses defendant Chesbrough of permitting corrections officers to overhear his confidential medical complaints, falsifying medical records, and refusing to document his complaints. Dkt. No. 45 at 17; Dkt. No. 179 at 5; Dkt. No. 179-2 at 48. Plaintiff does not, however, explain the medical condition from which he was suffering at the times defendant Chesbrough allegedly failed to document his complaints or approximately when this occurred. Without this information, the court cannot make a determination regarding whether the failure to document a complaint was sufficiently serious or whether the condition itself was sufficiently serious such that it required documentation or treatment.

Plaintiff alleges that, on February 5, 2009, defendant Chesbrough denied him access to his healthcare provider. Dkt. No. 179 at 5. Again,

however, plaintiff does not explain the conditions from which he was suffering at the time that required additional treatment from his healthcare provider. *Id.* Moreover, a review of the record reflects a letter written by plaintiff to defendant Weissman on February 27, 2009, regarding defendant Chesbrough's conduct, which repeats the allegations of permitting corrections officials to overhear his confidential medical complaints and falsifying medical records. Dkt. No. 179-3 at 45. The letter, however, does not explain how plaintiff suffered any harm as a result of defendant Chesbrough's conduct.

Even considering all of the record evidence in the light most favorable to plaintiff, I find that no reasonable factfinder could conclude that defendant Chesbrough provided plaintiff with inadequate medical treatment in violation of the Eighth Amendment. Accordingly, I recommend that defendants' motion be granted with respect to the deliberate medical indifference claim asserted against defendant Chesbrough.

### c.  Defendant Fairchild

Plaintiff accuses defendant Fairchild of ignoring his sick call request on July 8, 2010. Dkt. No. 45 at 23. The medical records provided in support of the defendants' motion, however, indicate that plaintiff was seen by medical staff on that date pursuant to an emergency sick call request

by plaintiff. Dkt. No. 175-1 at 6. According to the medical note from that date, plaintiff complained of his chronic knee condition, but no swelling was noted. *Id.* The next day, plaintiff was again seen by medical staff, at which time he complained of falling on the previous day. *Id.* On that occasion, plaintiff was advised to increase compresses and provided pain medication. *Id.*

Plaintiff also generally complains that defendant Fairchild (1) aggravated his medical conditions; (2) permitted corrections officers to overhear his confidential medical complaints; (3) failed to document his complaints; and (4) falsified his medical records. *Id.* at 31; Dkt. No. 179-2 at 46. Plaintiff fails, however, to adduce any evidentiary support of these allegations. Without more, the bare contentions are not sufficient to give rise to a dispute of material fact with respect to whether defendant Fairchild provided plaintiff inadequate medical care in accordance with the Eighth Amendment. Accordingly, I recommend that defendants' motion be granted insofar as it seeks dismissal of the deliberate medical indifference claim against defendant Fairchild.

### d.    Defendant Holmes

Plaintiff alleges that, on or about August 25, 2008, while he was boarding a bus to be transferred to Upstate, he fell and injured his right knee and hip. Dkt. No. 45 at 15. Upon arriving at Upstate, he was interviewed by defendant Holmes, who, plaintiff alleges, neither documented plaintiff's complaint that he fell nor examined him. *Id.*; *see also* Dkt. No. 179-2 at 44. Plaintiff also contends that defendant Holmes confiscated his asthma medications and walking cane at that time. Dkt. No. 45 at 15; Dkt. No. 179-2 at 44. Plaintiff's medical records, however, reflect that defendant Holmes issued plaintiff a temporary permit for a knee brace and cane to be used outside of his cell, and she documented the issues plaintiff discussed with her regarding his right knee, left testicle, and asthma. Dkt. No.175-1 at 43-44, 46. In addition, she indicated plaintiff should be placed on a bottom bunk. *Id.* at 47.

Plaintiff contends that on August  16, 2008, and August 17, 2008, defendant Holmes responded to his sick call requests but ultimately ignored his complaints concerning his knee. Dkt. No. 45 at 15; Dkt. No. 179-2 at 44-45. Plaintiff explains that he had "injur[ed] [him]self," prompting him to make an emergency sick call, but does not give any indication of the seriousness of his injuries. *Id.* Plaintiff acknowledges that

he was treated for his asthma on August 17, 2008, and his medical records reflect that, during an emergency sick call on that date, he was permitted to use his inhalers. *Id.*; [Dkt. No. 175-1 at 41](Dkt. No. 175-1 at 41).

In light of the evidence now before the court, I have determined that no reasonable factfinder could conclude that defendant Holmes provided plaintiff inadequate treatment in violation of the Eighth Amendment. With respect to this claim, the record is comprised of plaintiff's allegations on the one hand, and his medical records on the other. The medical records reflect that defendant Holmes interviewed plaintiff on August 15, 2008, documented his complaints, issued him a permit for a knee brace and cane, and recommended he be housed on a bottom bunk. On August 17, 2008, defendant Holmes treated plaintiff for his asthma symptoms. Although plaintiff alleges that he complained to defendant Holmes on August 16, 2008, of an injury to his knee, he does not explain the seriousness of his injury, and there is nothing in his medical records to indicate that he suffered a serious injury to his knee at or about that time. Accordingly, I recommend that defendants' motion be granted with respect

to the deliberate medical indifference claim asserted against defendant Holmes.[27]

### H.    Status of Plaintiff's Claims Against Unserved Defendants

By text orders dated July 30, 2014, plaintiff was ordered to show cause why his claims against defendants Whipple, Jones, Basket, and Cusack should not be dismissed based upon the fact that those individuals were not timely served pursuant to Rule 4(m) of the Federal Rules of Civil Procedure and rule 4.1(b) of the local rules of practice for this court. Dkt. Nos. 186, 187. Plaintiff has responded that he "has no recollection of being advised and/or informed that [defendants Whipple, Jones, Basket, and Cusack] were not served with the summons and complaints within the required time frame." Dkt. No. 188.

Rule 4(m) of the Federal Rules of Civil Procedure requires that a party be served within one hundred twenty days of issuance of the summons, absent a court order extending that period.[28] Fed. R. Civ. P.

---

[27]    Because I have recommended dismissal of the deliberate medical indifference claim as against defendants Atkinson, Bellnier, Chesbrough, Clemons, Colvin, Fairchild, Holmes, Johnson, Lempke, Parmer, Perez, Prebalick, Rock, Roew, Smith, Thomas, Weinstock, and Weissman, I have not addressed defendants' alternative argument that those individuals are entitled to qualified immunity from suit.

[28]    Specifically, Rule 4(m) provides that,

> [i]f a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without

4(m). In the event that a party seeks an extension of that time period, "where good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Panaras*, 94 F.3d at 340 (citing Fed. R. Civ. P. 4(m)); *see also Zapata v. City of N.Y.*, 502 F.3d 192, 196 (2d Cir. 2007) ("[D]istrict courts have the discretion to grant extensions of the service period even where there is no good cause shown[.]"); *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists, and whether an extension may be granted in its absence. *Zapata*, 502 F.3d at 197.

A plaintiff's *pro se* status entitles him to a certain degree of leniency insofar as service of process is concerned, and courts generally favor

---

> prejudice . . . or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period[.]

Fed. R. Civ. P. 4(m). The court's local rules of practice shorten the time for service from the 120-day period under Rule 4(m) to sixty days. N.D.N.Y. L.R. 4.1(b).

resolution of a case on its merits rather than on the basis of a procedural technicality. *Poulakis v. Amtrak*, 139 F.R.D. 107, 109 (N.D. Ill. 1991). When a plaintiff proceeds *in forma pauperis*, as is the case in this instance, the court is obligated to issue the plaintiff's process to the United States Marshal, who must, in turn, effect service upon the defendants, thereby relieving the plaintiff of the burden to serve once reasonable steps have been taken to identify the defendants named in the complaint. Fed. R. Civ. P. 4(c)(3); 28 U.S.C. § 1915(d); *see also Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996) ("[Section] 1915([d]) provides that the officers of the court 'shall issue and serve all process' when a plaintiff is proceeding in forma pauperis."). Of course, this does not mean that a *pro se* plaintiff may stand idle upon being notified that efforts by the U.S. Marshals Service to serve a particular defendant have been unsuccessful. *VanDiver v. Martin*, 304 F. Supp. 2d 934, 938-43 (E.D. Mich. 2004). A plaintiff who does so acts at his peril, and risks dismissal of his claims against an unserved defendant.  As the Second Circuit has observed,

> [i]f a plaintiff proceeding IFP chooses to rely on the Marshals to serve the relevant parties, and it becomes apparent that the Marshals will not accomplish by the Rule 4(m) or court-ordered deadline, she must advise the district court that she is relying on the Marshals to effect service and request a further extension of time for them to do so.

*Meilleur v. Strong*, 682 F.3d 56, 63 (2d Cir. 2012). Accordingly, a district court must look at the facts and circumstances surrounding each case to determine whether good cause exists. *Meilleur*, 682 F.3d at 63.

The fact that defendants Whipple, Jones, Basket, and Cusack have not been served or otherwise appeared in the action within the appropriate time period is well documented in the court's docket sheet, which also plainly reflects the filing of unexecuted returns of service with respect to all four of those defendants. Dkt. Nos. 39, 57, 48, 63, 64, 151. There is nothing in the record to suggest plaintiff did not receive notice that service went unexecuted as to those individuals. Moreover, on February 4, 2013, the court sent plaintiff a courtesy copy of the docket sheet, which (again) reflects the failed service on defendants Whipple, Jones, Basket, and Cusack. Dkt. No. 137. It is not the court's obligation to affirmatively notify plaintiff of such circumstances and prod him into action. Instead it is the responsibility of plaintiff, who is an experienced litigator, to keep apprised of the status of his action.

Based upon a review of the record, I am unable to find good cause justifying plaintiff's failure to effectuate timely service, and find no sufficient basis presented to exercise my discretion in favor of extending the governing period of service. Accordingly, because this court has never

acquired jurisdiction over them, the complaint should be dismissed as against those defendants, without prejudice. *See Miss. Publ'g Corp. v. Murphree*, 326 U.S. 438, 444-45 (1946) ("[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served."); *accord, Osrecovery, Inc. v. One Group Int'l, Inc.*, 234 F.R.D. 59, 60 (S.D.N.Y. 2005).

    I.    <u>Status of the Doe Defendants</u>

Plaintiff's amended complaint names John and Jane Does as defendants. *See generally* Dkt. No. 45. In his initial order addressing plaintiff's original complaint, Judge McAvoy instructed plaintiff to take reasonable steps through discovery to ascertain the names of the unidentified defendants. Dkt. No. 5 at 22. The court also warned plaintiff that the failure to ascertain the Doe defendants' identities "so as to permit the timely amendment of the Complaint and service of process" would result in dismissal of the claims asserted against those individuals. *Id.* at 22-23. Discovery is now closed, and plaintiff has not identified or timely served the Doe defendants. Accordingly, I recommend that plaintiff's claims asserted against those individuals be dismissed.

## IV.   SUMMARY AND RECOMMENDATION

The extensive allegations set forth in plaintiff's amended complaint give rise to a mixture of claims, some of which are potentially cognizable and others that are subject to dismissal at this juncture. Plaintiff's damage claims against the defendants in their official capacities are precluded by the Eleventh Amendment and should be dismissed. To the extent plaintiff's complaint asserts claims based solely upon verbal harassment and threats, those claims are also subject to dismissal. In addition, Plaintiff's denial of access to the court claims are similarly subject to dismissal based both upon his failure to establish that (1) one of the defendants was personally involved in the misplacement of his legal documents, and (2) the other two defendants acted with the requisite mental state. Further, plaintiff's claims against defendants Fischer and Wright are subject to dismissal based upon the lack of their personal involvement in the conduct forming the basis for plaintiff's claims against them. Additionally, plaintiff's deliberate medical indifference claims asserted against defendants Atkinson, Bellnier, Chesbrough, Clemons, Colvin, Fairchild, Holmes, Johnson, Lempke, Parmer, Perez, Prebalick, Rock, Roew, Smith, Thomas, Weinstock, and Weissman are subject to dismissal based upon plaintiff's failure to meet the governing standard. Plaintiff's claims against

defendants Whipple, Jones, Basket, and Cusack are subject to dismissal, without prejudice, based upon the fact that those defendants have not appeared in the action and were not served within the requisite time and plaintiff has failed to show good cause to why that time, should be extended. Finally, the claims against the John Doe defendants are now subject to dismissal based on plaintiff's failure to identify and timely serve them. Defendants are not, however, entitled to summary dismissal of plaintiff's procedural due process claims at this procedural juncture. Based upon the foregoing, is it hereby respectfully

RECOMMENDED that defendants' motion for partial summary judgment (Dkt. No. 174), be GRANTED, in part, and that the following claims be dismissed, with prejudice:

    (1)    Plaintiff's damage claims against the defendants in their official capacities,

    (2)    Any cause of action based solely upon verbal harassment and threats,

    (3)    Plaintiff's denial of court access claims,

    (4)    Plaintiff's free exercise and RLUIPA claim asserted against defendant Bellnier,

(5)     Plaintiff's failure to protect claim asserted against defendant Colvin,

(6)     Plaintiff's failure to protect claim asserted against defendant Lempke,

(7)     Plaintiff's deliberate medical indifference claims asserted against defendants Atkinson, Bellnier, Chesbrough, Clemons, Colvin, Fairchild, Holmes, Johnson, Lempke, Parmer, Perez, Prebalick, Rock, Roew, Smith, Thomas, Weinstock, and Weissman; and

(8)     Plaintiff's claims against all of the John Doe defendants; and it is further

RECOMMENDED that plaintiff's claims against Whipple, Jones, Basket, and Cusack be DISMISSED, without prejudice, based upon the fact that those defendants were not served with the summons and complaint within sixty days of the filing of plaintiff's complaint; and it is further hereby

RECOMMENDED that, except as to the foregoing, defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     February 23, 2015
           Syracuse, New York



Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark LABOUNTY, Plaintiff,
v.
Philip COOMBE, Jr., Wayne Strack, and Donald
Selsky, Defendants.
No. 95 CIV 2617(DLC).

Dec. 26, 2001.

Mark LaBounty, Pro Se, Marcy Correctional Facility,
Marcy, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, for Defendants.

OPINION AND ORDER

COTE, District J.

**\*1** On April 17, 1995, Mark LaBounty ("LaBounty"),
who is presently incarcerated at Marcy Correctional
Facility, brought this action *pro se* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging that the defendants
violated his constitutional rights while he was an inmate at
Fishkill Correctional Facility ("Fishkill"). On November
25, 1996, the Court granted in part the defendants' motion
to dismiss. On February 5, 2001, the Court of Appeals for
the Second Circuit vacated in part the November 25, 1996
decision, and remanded LaBounty's procedural due
process claim for further development.FN1 This claim stems
from LaBounty's wrongful confinement in "SHU" for 30
days, a claim that this Court had dismissed for failure to
identify a violation of a liberty interest. After discovery,
defendants now move for summary judgment. For the
reasons set forth below, the motion is denied.

> FN1. The claims brought by the plaintiff that
> survived summary judgment were tried before a
> jury on October 4, 1998. On October 6, 1998,
> the jury returned a verdict for LaBounty on his
> claim that Nurse Millie Rivera had been

deliberately indifferent to his serious medical
needs and awarded him $1 in nominal damages.
The Second Circuit denied the appeals from the
trial and the summary judgment opinion, but
reversed the dismissal of the due process claim at
issue here. *LaBounty v. Kinkhabwala,* No.
99-0329, 2001 WL 99819 (2d Cir. Feb. 5, 2001).

BACKGROUND

LaBounty's allegations against the defendants are
fully described in the Court's November 25, 1996 Opinion,
familiarity with which is presumed. *LaBounty v.
Coombe, et al.,* No. 95 Civ. 2616, 1996 WL 684168
(S.D.N.Y. Nov. 25, 1996). Here, the Court only describes
those facts necessary for the purposes of this motion.FN2

> FN2. To the extent that the plaintiff reiterates in
> his opposition claims that have been previously
> dismissed or makes new claims unrelated to the
> issues which have been remanded, those claims
> are not properly before this Court and the Court
> does not consider them here.

By Order dated February 13, 2001, the Court
described the issues remanded by the Court of Appeals for
further development as follows:

1. The plaintiff's procedural due process claim that the
disciplinary hearing held on January 23 and 27, 1995
was delayed, that witnesses at that hearing were
examined outside his presence, and that Vuturo
prejudged the merits of the hearing.

2. Whether plaintiff's due process rights were violated
while he was in SHU during the period beginning on
January 27, 1995, by

(a) a denial of medication for his ear infection;

(b) the prescription of Flexeril for a back condition;

(c) Nurse Rivera substituting his back pain medication
with an unknown drug which caused him dizziness and

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

head and stomach aches;

(d) a denial of paper and pencils;

(e) a denial of out-of-cell exercise;

(f) a denial of access to library books;

(g) not being permitted to mail letters in the evening; and

(h) the censorship or destruction of his mail, legal documents, and personal papers.

3. Whether, under *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny, the plaintiff has a liberty interest sufficient to bring the due process claims described in items 1 and 2.

The parties were ordered to inform the Court if they had any other understanding of the Court of Appeals' Order of remand.

By letter dated February 27, 2001, the defendants agreed that the February 13, 2001 Order correctly described the remanded issues. By letter dated February 17, 2001, the plaintiff also agreed with the description of the issues, but indicated a wish to add three additional issues. By Order dated February 28, 2001, the Court found that the issues remanded for further development were those described in the February 13, 2001 Order.

**\*2** The following facts are undisputed or as shown by the plaintiff unless otherwise noted. On January 12, 1995, LaBounty went to the clinic at Fishkill to renew his prescriptions for hypertension medication, and to complain of an ear infection. On that day, Nurse Ronald Waller issued an "Inmate Misbehavior Report" against him, which included the charge of refusing a direct order. Also on that day, Robert L. Macomber issued a "Inmate Misbehavior Report" against LaBounty, which included the charge of possessing outdated medications in his cell.

*Tier III Hearing*

On January 23 and 27, 1995, hearing officer Joseph

Vuturo ("Vuturo") conducted a "Tier III" disciplinary hearing to address the charges against plaintiff. [FN3] On January 27, Vuturo found LaBounty guilty of violating a direct order and possessing outdated medications. Vuturo sentenced LaBounty to 90 days of segregated confinement in the Special Housing Unit ("SHU"), of which 60 days were suspended. LaBounty served 30 days in SHU, beginning on January 27, 1995.

> [FN3.] Tier III hearings are held for " 'the most serious violations of institutional rules.' " *Colon v. Howard,* 215 F.2d 227, 230 n. 1 (2d Cir.2000) (citation omitted).

On January 27, 1995, LaBounty appealed his conviction to the Commissioner of the Department of Correctional Services ("DOCS"). On March 22, 1995, the DOCS Director of the Special Housing / Inmate Disciplinary Program, defendant Donald Selsky ("Selsky"), reversed LaBounty's conviction on the charge of possessing outdated medication because the "[m]isbehavior report fail[ed] to support [the] charge." On February 6, 1996, Selsky "administratively reversed" plaintiff's conviction on the only remaining charge-disobeying a direct order-"due to off-the-record communication used as evidence in hearing." Selsky directed that any records containing references to the January 27, 1995 hearing be expunged.

*SHU Conditions*

The SHU regulations provide that, while in SHU, inmates are confined to their cells for 23 hours a day, and are permitted to leave their cells for recreation, visits to the medical department, legal visits, guidance or counselor interviews, and for showers two times per week. SHU may be imposed for disciplinary and non-disciplinary, or administrative, reasons. Between January 1, 1991 and December 31, 1996, 162,601 of the 215,701 inmates in the New York correction system received "confinement sanctions." 106,265 inmates were penalized by "keeplock" confinement. In 1993, 4.2% of the inmates in DOCS' confinement were sentenced to SHU, and in 1994, 4.8% were sentenced to SHU.

*Plaintiff's Experience in SHU*

While in SHU, LaBounty was deprived of all of the

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

pain medication which had been prescribed for "constant severe pain related to his spinal condition," [FN4] as well as medication for an ear infection. LaBounty complained to defendant Nurse Rivera and to other medical staff that he was not receiving his pain medication and that he was suffering from an ear infection, but he received no response from them. On February 13, 1995, LaBounty was prescribed "Flexeril" by a physician's assistant, but LaBounty claims the medicine was merely prescribed as a "pretext" and that it did not help his severe pain or his ear infection. LaBounty was in "constant severe pain for the duration of his 30-days in SHU." LaBounty was not treated for his ear infection until he was released from SHU and given a CAT Scan. The CAT Scan revealed that the ear infection had become "Mastoiditis." As a result of the untreated ear infection, LaBounty lost the hearing in his right ear.

> FN4. Plaintiff asserts that his spinal condition was, at all relevant times, well-documented and diagnosed.

**\*3** While he was in SHU, LaBounty was prescribed one refill of his hypertension medication. A nurse gave the refill to officers, but the officers refused to give plaintiff his medication. After LaBounty repeatedly threw his bed against the cell door, the SHU evening supervisor came to his cell and later ordered the SHU officer to give LaBounty his medication.

While he was in SHU, LaBounty was deprived of any "out-of-the-cell exercise," which he requested each day. He was given only two showers during his 30 days in SHU, and each shower was only one to two minutes long. He requested a pen from the SHU officer in order to write his appeal to the Commissioner, and the officer refused. Plaintiff later received a pen from the "porter." [FN5] Plaintiff requested other writing materials from the officers, but they did not give him any. LaBounty received all of his writing materials from the porter and other inmates when they were let out for exercise. Before he was released from SHU, the officers opened LaBounty's "property bags" and "removed legal material relevant to this case and other pending cases." LaBounty was refused books and newspapers while he was in SHU despite requesting them.

> FN5. A porter is an inmate who is also serving a sentence in SHU.

DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. *See also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a *pro se* party's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

A. *Protected Liberty Interest*

**\*4** A claim for procedural due process violations requires a determination of "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

(2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields*,-F.3d-, 2001 WL 457767, at \*7 (2d Cir. Nov. 1, 2000) (errata filed Apr. 26, 2001) (citation omitted). After the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), a determination that there is a liberty interest also requires a two-part analysis. *Tellier,*-F.3d-, 2001 WL 457767, at \*7. " 'As a result of *Sandin,* a prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation." ' *Id.* (citation omitted).

*Atypical and Significant Hardship*

The defendants argue that LaBounty does not have a protected liberty interest because his confinement in SHU was not atypical or significant. To determine whether the conditions of a particular confinement impose an "atypical and significant hardship" one must undertake a factual analysis. *Id.* "The circumstances that the court must examine include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions....' " *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000) (citation omitted). It is clear that "[c]onfinement in SHU may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement." *Id.* " 'The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." ' *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (citation omitted).

Material issues of fact exist as to whether LaBounty's confinement in SHU was "atypical" as compared to the conditions of other inmates in both administrative confinement and in the general population. As noted above, LaBounty asserts that while he was in SHU, he was denied medication and medical treatment, writing materials, books, and exercise.[FN6] If proven true, these conditions would appear to be atypical when compared to the conditions of confinement not only of inmates in administrative confinement and in the general population, but also of other inmates in punitive segregation. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 304.1 *et seq.; Colon,* 215 F.3d at 230 (stating that "normal conditions of SHU confinement in New York" include one hour of exercise per day, two showers a week, and a limited number of books). LaBounty further asserts that the conditions in SHU caused him significant hardship in a number of ways, including severe physical pain and the loss of hearing.

FN6. Although not included in the list of issues from the February 13, 2001 Order, LaBounty also presents evidence that he was allowed only two showers in one month.

\*5 The defendants rely on the length of LaBounty's sentence of confinement for their argument that his punishment was not atypical and significant. While it has been found in at least one other case that as much as 101 days in SHU did not run afoul of *Sandin, Sims,* 230 F.3d at 23, there is no litmus test based on the length of confinement alone-as the remand here demonstrates. *See also Colon,* 215 F.3d at 232 n. 5. Even a relatively brief term in segregated confinement may violate the law. *Taylor v. Rodriguez,* 238 F.3d 188, 196 (2d Cir.2001).

The defendants have also submitted evidence regarding the percentage of inmates in disciplinary confinement. These statistics do not address the specific conditions experienced by LaBounty during his confinement in SHU. *See Welch v. Bartlett,* 196 F.3d 389, 393-94 (2d Cir.1999) (vacating summary judgment where plaintiff alleged that SHU hygiene conditions were far inferior to those in general population). "[M]erely calculating the percentage of prisoners sentenced to SHU confinement" says nothing about the qualitative experience of prisoners in confinement and the relative degree to which they are deprived of the care and facilities at issue here. *Kalwasinski v. Morse,* 201 F.3d 103, 107 (2d Cir.1999).

The defendants make several additional arguments which can swiftly be rejected. They argue that only those deprivations experienced by LaBounty that independently constitute a constitutional violation-such as deliberate indifference to his serious medical needs in violation of the Eighth Amendment or an interference with his ability to pursue litigation in violation of the First Amendment-should be considered in judging whether LaBounty suffered atypical and significant hardships.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

There is no authority within either *Sandin* or its progeny in this Circuit for such a heightened showing. The defendants also argue that the issue of whether LaBounty suffered atypical and significant hardships should be tested not by his personal experience in SHU but by what the prison regulations prescribe as the standard for treatment of SHU prisoners. They contend, for instance, that what is relevant is that SHU prisoners are supposed to receive one hour per day of out of cell exercise and either two or three showers a week (depending on the level of prison) and not that LaBounty contends he received no opportunity to exercise and two brief showers in one month. The individualized inquiry required by the law is of the actual experience of the inmate, not what the experience should have been. *Sims,* 230 F.3d at 22-23. Finally, the defendants contend that they are entitled to summary judgment because while LaBounty's description of his deprivations is sufficient to create issues of fact regarding his own experience, he has not presented evidence that inmates in general population or in administrative confinement were not subjected routinely to those same deprivations. LaBounty has, until this point in the litigation, proceeded *pro se.* He was entitled to rely on the prison's regulations, well established law, and the basic standards of decency, to make the point that the deprivations of medical care, exercise, showers, books, and writing material that he alleges he experienced for one month cannot be the general experience of inmates incarcerated in New York state.

*Liberty Interest Created by State Law*

**\*6** The defendants argue that New York State has not granted inmates a protected liberty interest in remaining free from disciplinary confinement. In *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983), the Supreme Court held that a state-created "liberty interest arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). *Sandin* did not replace *Hewitt*'s description of the process that creates a cognizable "liberty interest." *Tellier,*-F.3d-, 2001 WL 457767, at *7; *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999); *Welch,* 196 F.3d at 394 n. 4. Where a regulation requires "in language of an unmistakably

mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates," *Tellier,*-F.3d-, 2001 WL 457767, at *8 (citation omitted), then the regulation creates a protectable liberty interest.

New York regulates the process through which SHU disciplinary confinement may be imposed. Regulations allow such confinement only upon "[d]isposition of superintendent's Tier III hearing for a designated period of time as specified by the hearing officer." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.2 (McKinney 1999). The regulations further explain the manner in which the Tier III hearings must be conducted.

Upon receipt of a misbehavior report from the review officer, the hearing officer *shall* commence the superintendent's hearing as follows:

(a) The misbehavior report *shall* be served on the inmate at least 24 hours before the superintendent's hearing. If the inmate is confined and requests an assistant, the hearing *may not* start until 24 hours after the assistant's initial meeting with the inmate.

(b) The inmate *shall* be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing *must* be electronically recorded.

(c) The inmate when present may reply orally to the charge and/or evidence and *shall* be allowed to submit relevant documentary evidence or written statements on his behalf.

N.Y. Comp.Codes R. & Regs. tit. 7, § 254.6 (McKinney 2000) (emphasis supplied). The regulations provide that "where the hearing officer affirms the charges on the basis of the evidence, the hearing officer may impose ... confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period." *Id.* § 254.7.

It has long been recognized that New York's regulations authorizing restrictive confinement in SHU "provide sufficient limitation on the discretion of prison officials to create a liberty interest." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also Sealey,* 197 F.3d at

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

585 (construing New York regulation regarding administrative confinement in SHU). New York has therefore created a liberty interest protected by the Due Process Clause.

B. *Qualified Immunity*

**\*7** The defendants contend that they are entitled to qualified immunity. Qualified immunity protects a state actor sued in his individual capacity from a suit for damages. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). A state actor is qualifiedly immune if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Id.* (citation omitted).

LaBounty claims that he was deprived of his procedural due process rights during the 1995 disciplinary hearing because he was denied, among other things, the right to call witnesses and to introduce documentary evidence.[FN7] The law was clearly established in January 1995 that inmates have the right to call witnesses and submit documentary evidence at disciplinary hearings.[FN8] *Wolff v.. McDonnell,* 418 U.S. 539, 566 (1974); *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Since the contours of LaBounty's due process rights were well defined by both Supreme Court and Second Circuit precedent by the time Vuturo conducted LaBounty's disciplinary hearing in January 1995, the defendants have not demonstrated that they are entitled to qualified immunity as a matter of summary judgment.

> FN7. The parties agreed in February 2001 that the procedural irregularities at issue here were the delay in the hearing, the examination of witnesses outside of LaBounty's presence, and a prejudgment of the merits by a hearing officer. The defendants do not object to LaBounty's emphasis in this motion on the interference with his right to offer evidence.

> FN8. The defendants characterize the pertinent inquiry as whether the law was clearly established in January 1995, that inmates have a liberty interest in remaining free from SHU confinement. Defendants argue that the Second

Circuit law since *Sandin* has been "ambiguous at best." The extent to which *Sandin* may have unsettled the law on this issue is irrelevant since *Sandin* was handed down after LaBounty's hearing. The law was "clearly established" as of January 1995, that inmates have a liberty interest in remaining free from segregated confinement such as SHU. *See, e.g., Walker v. Bates,* 23 F.3d 652, 655-56 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984).

C. *Personal Involvement*

Defendants contend that they are not liable for the alleged due process violations because none of the remaining defendants was personally involved in the January 1995 disciplinary hearing. The defendants argue that hearing officer Vuturo is the only proper defendant and that no action may proceed against him because he was never served in this case. As LaBounty will be appointed counsel in this case, counsel for all parties will be able to explore this issue further.[FN9]

> FN9. The defendants argue that LaBounty failed to exhaust his administrative remedies by not filing grievances regarding the conditions in SHU. Because the defendants raised this argument for the first time in their reply brief and it has not been developed, it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage").

D. *Appointment of Counsel*

Plaintiff has submitted an application requesting counsel. In determining whether to grant a request for counsel, the Court must consider
the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

*Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). As a threshold matter, plaintiff must demonstrate that his claim has substance or a likelihood of success in order for the Court to grant plaintiff's request for counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). Based on the Court's familiarity with this case and the legal issues presented, LaBounty's claim has substance and LaBounty has shown a need for representation. Accordingly, plaintiff's request for counsel is granted.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied. Plaintiff's request for counsel is granted. The Pro Se Office of this Court shall seek Pro Bono counsel for this plaintiff.

**\*8** SO ORDERED:

S.D.N.Y.,2001.

LaBounty v. Coombe
Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner NYS
DOCS; William Brunet, Seargent; SGT. Davis; SGT.
Emery; J. Baker, C.O.; W. Smith, C.O.; M. Hamilton,
C.O.; Mushen, C.O.; Supt. Barkley; Nurse L. Lipscum;
Thomas Farns, C.O.; Walter Lincoln, C.O., Defendants.
No. 94–CV–985(LEK)(DRH).

Feb. 6, 2001.
*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

**\*1** Presently before the Court are Plaintiff's motions
for relief from judgment and for recusal of the
undersigned. For the reasons set forth below, Plaintiff's
motions are denied.

I. BACKGROUND

Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
commenced the present 42 U.S.C. § 1983 action alleging
violations of his Constitutional Rights on August 5, 1994.
On July 18, 1993, while Plaintiff was incarcerated at
Riverview Correctional Facility, defendant Baker alleges
that she witnessed Plaintiff exposing himself to her in the
recreation yard. Plaintiff was then taken from the yard to
the infirmary by defendants Baker, Smith, and Hamilton.
In his Amended Complaint, Defendant alleges, in relevant
part, that he was repeatedly assaulted by defendants
Davis, Smith, Mushen, and Hamilton while defendants
Liscum, Baker, and Emery stood by and watched in
violation of his Eighth Amendment rights. Plaintiff then
alleges that he was escorted to the prison's special housing
unit ("S.H.U.") and received further physical mistreatment
from defendants Emery, Mushen, Hamilton, Smith, Farns,
and Lincoln.

Plaintiff also alleges that his due process rights under

the Fourteenth Amendment were violated by the
disciplinary proceeding resulting from the incident, which
was conducted by defendant Brunet. Finally, Plaintiff
alleges that defendant Barkley participated in the violation
of these rights by failing to address Plaintiff's grievances
and by designating a biased hearing officer, defendant
Brunet, to preside over Plaintiff's Tier III hearing.

On June 14, 1999, defendants Brunet, Baker and
Barkley ("Defendants") filed a motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Plaintiff filed an
affirmation in opposition to Defendants' motion on June
23, 1999 and a letter response on July 6, 1999. By an
Order dated October 25, 1999, this Court granted
Defendants' motion for summary judgment and dismissed
Plaintiff's case against them in its entirety.<sup>FN1</sup> Plaintiff's
current motions for relief from judgment and recusal were
filed on November 12, 1999 and March 23, 1999,
respectively.

> **FN1.** Also still pending before the Court is a
> motion for summary judgment filed by Plaintiff
> September 1, 1998. The motion was originally
> dismissed by the Court's Order adopting the
> Report–Recommendation of United States
> Magistrate Judge David R. Homer, which held
> that the motion was untimely and, in the
> alternative, that it failed on the merits. Then, by
> an Order dated June 1, 1999, the Court vacated
> its previous order and held that Plaintiff's motion
> would be addressed on the merits, along with
> Defendants' motion for summary judgment.
> However, Judge Homer's
> Report–Recommendation did address the merits
> of Plaintiff's motion. The Court has undertaken a
> de novo review of the record and has determined
> that Plaintiff's motion should be dismissed for the
> reasons discussed in the
> Report–Recommendation.

II. ANALYSIS

A. Relief from Judgment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Plaintiff's motion, although termed a "motion for relief from judgment," is brought pursuant to Local Rule 7.1(g). Accordingly, it will be treated by the Court as a motion for reconsideration.

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by Fed.R.Civ.P. 60. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R. 1, 3 (N.D.N.Y.1995). Defendant does not argue that there has been an intervening change in controlling law or the availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981).

1. *Discovery Matters*

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

2. *Defendant Baker*

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. *See Barr v. Abrams,* 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

[t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

### 3. *Defendant Barkley*

**\*3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (1994). Liability may not be based on respondeat superior or vicarious liability. *See Al– Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).

Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright, 21 F.3d at 501.*

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's

grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at *5– *6 (S.D.N.Y. July 13, 1998) (citing *Beaman v. Coombe,* No. 96 Civ. 3622, 1997 WL 538833, at *3 (S.D.N.Y. Aug. 29, 1997), *aff'd in relevant part* No. 97–2683, 1998 WL 382751, at **1 (2d Cir. May 13, 1998)). Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

### 4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner,* 515 U.S. 472 (1995), because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell,* 418 U.S. 539 (1974); and (3) defendant Brunet is protected by qualified immunity in any event.[FN2] In order to establish a due process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

> FN2. Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey,* 512 U.S. 477 (1994), and *Edwards v. Balisok,* 520 U.S. 641 (1997). Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards." Jenkins v. Haubert,* 179 F.3d 19, 27

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

(2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation

of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at *2 (2d Cir. Dec 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

**\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

which to compare Plaintiff's conditions of confinement to other forms of segregated confinement and to the general population. If such a generalized showing by the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff was inappropriate. *See id.* at 394. The Court held that

> [t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.
>
> *Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

> are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that 10% of prisoner were subject to terms in SHU made such

confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement.

Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin.* However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

b. *Process Due*

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense.' " *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." *Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to

articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at *6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness to the events in question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

c. *Qualified Immunity*

Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

(1) whether the right in question was defined with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

"reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses were clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera,* 1994 WL 263417, at *6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

B. Recusal

Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000);

*Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at **2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned." ' *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at **2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible." ' *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

III. CONCLUSION

**9** ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2001.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Alvarez v. Coughlin
Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1033652 (N.D.N.Y.)
**(Cite as: 2012 WL 1033652 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Todd JOHNSON, Plaintiff,
v.
Christopher FERNANDEZ, Correctional Officer,
Coxsackie Correctional Facility; Kim Gerwer, Education Supervisor, Coxsackie Correctional Facility;
Jason Yung, Sergeant, Coxsackie Correctional Facility; and Mary Ann Bathrick, Clerk II, Coxsackie
Correctional Facility, Defendants.

No. 9:09–CV–626 (FJS/ATB).
March 27, 2012.

Todd Johnson, Beacon, NY, pro se.

Office of the New York State Attorney General,
Michael G. McCartin, AAG, of Counsel, Albany,
NY, for Defendants.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate
Judge Baxter's March 1, 2011 Report and Recommendation, *see* Dkt. No. 51, and Plaintiff's objections thereto, *see* Dkt. Nos. 53, 56, 60, & 61.

Plaintiff Todd Johnson, a New York State prison inmate, commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Correctional Officer Christopher Fernandez, Sergeant Jason Yung, Education Supervisor Kim Gerwer, and Calculations Clerk Mary Ann Bathrick. In his complaint, Plaintiff alleged that, during the course of his confinement at Coxsackie Correctional Facility, Defendants violated his civil rights by (1) using excessive force against him in violation of the Eighth Amendment, (2) interfering with his First Amendment right to the free flow of incoming and outgoing mail, and (3) infringing upon his Fourteenth Amendment procedural due process rights

during a disciplinary hearing. *See generally* Dkt. No. 1.

On June 28, 2010, Defendants filed a motion for summary judgment, in which they sought dismissal of Plaintiff's complaint in its entirety. *See* Dkt. No. 39. Plaintiff opposed that motion. *See* Dkt. No. 43. In a Report Recommendation dated March 1, 2011, Magistrate Judge Baxter recommended that this Court grant Defendants' motion for summary judgment and dismiss Plaintiff's complaint in its entirety. *See* Dkt. No. 51. Plaintiff objected to Magistrate Judge Baxter's recommendation on March 28, 2011, *see* Dkt. No. 53, and filed supplemental objections on May 5, 2011, and August 25, 2011, *see* Dkt. Nos. 56, 60; and, on September 14, 2011, Plaintiff filed another letter in further opposition thereto, *see* Dkt. No. 61.

In reviewing a magistrate judge's report and recommendation, a district court may accept, reject, or modify those recommendations in whole or in part. *See Linares v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, \*10 (N.D.N.Y. Sept.29, 2009) (quoting 28 U.S.C. § 636(b)(1)(C)). The court conducts a *de novo* review of the portions of the magistrate judge's recommendations to which a party makes "*specific* objection[.]" *Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781, \*2 (N.D.N.Y. Nov.23, 2011) (citations omitted). "To be 'specific,' the objection must, with particularity, 'identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection.' " *Id.* (quotation and footnote omitted). Where, however, a party makes no objection, or only conclusory or general objections, the court reviews for "clear error" only. *See id.* (citations omitted).

The Court has thoroughly reviewed Plaintiff's objections to Magistrate Judge Baxter's recommendations and finds them to be without merit. Although Plaintiff's objections are largely conclusory and repetitive of the arguments that he made in op-

Not Reported in F.Supp.2d, 2012 WL 1033652 (N.D.N.Y.)
**(Cite as: 2012 WL 1033652 (N.D.N.Y.))**

position to Defendants' motion for summary judg-
ment, the Court conducted a *de novo* review of Ma-
gistrate Judge Baxter's recommendations in light of
those objections. Having completed that review, the
Court hereby

**\*2 ORDERS** that Magistrate Judge Baxter's
March 1, 2011 Report and Recommendation is **AC-
CEPTED in its entirety** for the reasons stated
therein; and the Court further

**ORDERS** that Defendants' motion for sum-
mary judgment is **GRANTED** in its entirety; and
the Court further

**ORDERS** that the Clerk of the Court shall
enter judgment in favor of Defendants and close
this case; and the Court further

**ORDERS** that the Clerk of the Court shall
serve a copy of this Order on the parties in accord-
ance with the Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.
Johnson v. Fernandez
Not Reported in F.Supp.2d, 2012 WL 1033652
(N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Todd JOHNSON, Plaintiff,
v.
Christopher FERNANDEZ, Correctional Officer,
Coxsackie Correctional Facility; Kim Gerwer, Edu-
cation Supervisor, Coxsackie Correctional Facility;
Jason Yung, Sergeant, Coxsackie Correctional Fa-
cility; and Mary Ann Bathrick, Clerk II, Coxsackie
Correctional Facility, Defendants.

No. 9:09–CV–626 (FJS/ATB).
March 27, 2012.

Todd Johnson, Beacon, NY, pro se.

Office of the New York State Attorney General,
Michael G. McCartin, AAG, of Counsel, Albany,
NY, for Defendants.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate
Judge Baxter's March 1, 2011 Report and Recom-
mendation, *see* Dkt. No. 51, and Plaintiff's objec-
tions thereto, *see* Dkt. Nos. 53, 56, 60, & 61.

Plaintiff Todd Johnson, a New York State pris-
on inmate, commenced this civil rights action pur-
suant to 42 U.S.C. § 1983 against Defendants Cor-
rectional Officer Christopher Fernandez, Sergeant
Jason Yung, Education Supervisor Kim Gerwer,
and Calculations Clerk Mary Ann Bathrick. In his
complaint, Plaintiff alleged that, during the course
of his confinement at Coxsackie Correctional Facil-
ity, Defendants violated his civil rights by (1) using
excessive force against him in violation of the
Eighth Amendment, (2) interfering with his First
Amendment right to the free flow of incoming and
outgoing mail, and (3) infringing upon his Four-
teenth Amendment procedural due process rights

during a disciplinary hearing. *See generally* Dkt.
No. 1.

On June 28, 2010, Defendants filed a motion
for summary judgment, in which they sought dis-
missal of Plaintiff's complaint in its entirety. *See*
Dkt. No. 39. Plaintiff opposed that motion. *See* Dkt.
No. 43. In a Report Recommendation dated March
1, 2011, Magistrate Judge Baxter recommended
that this Court grant Defendants' motion for sum-
mary judgment and dismiss Plaintiff's complaint in
its entirety. *See* Dkt. No. 51. Plaintiff objected to
Magistrate Judge Baxter's recommendation on
March 28, 2011, *see* Dkt. No. 53, and filed supple-
mental objections on May 5, 2011, and August 25,
2011, *see* Dkt. Nos. 56, 60; and, on September 14,
2011, Plaintiff filed another letter in further opposi-
tion thereto, *see* Dkt. No. 61.

In reviewing a magistrate judge's report and re-
commendation, a district court may accept, reject,
or modify those recommendations in whole or in
part. *See Linares v. Mahunik,* No. 9:05–CV–625,
2009 WL 3165660, \*10 (N.D.N.Y. Sept.29, 2009)
(quoting 28 U.S.C. § 636(b)(1)(C)). The court con-
ducts a *de novo* review of the portions of the magis-
trate judge's recommendations to which a party
makes "*specific* objection[.]" *Trombley v. Oneill,*
No. 8:11–CV–0569, 2011 WL 5881781, \*2
(N.D.N.Y. Nov.23, 2011) (citations omitted). "To
be 'specific,' the objection must, with particularity,
'identify [1] the portions of the proposed findings,
recommendations, or report to which it has an ob-
jection and [2] the basis for the objection.' " *Id.*
(quotation and footnote omitted). Where, however,
a party makes no objection, or only conclusory or
general objections, the court reviews for "clear er-
ror" only. *See id.* (citations omitted).

The Court has thoroughly reviewed Plaintiff's
objections to Magistrate Judge Baxter's recom-
mendations and finds them to be without merit. Al-
though Plaintiff's objections are largely conclusory
and repetitive of the arguments that he made in op-

Not Reported in F.Supp.2d, 2012 WL 1033652 (N.D.N.Y.)
**(Cite as: 2012 WL 1033652 (N.D.N.Y.))**

position to Defendants' motion for summary judgment, the Court conducted a *de novo* review of Magistrate Judge Baxter's recommendations in light of those objections. Having completed that review, the Court hereby

**\*2 ORDERS** that Magistrate Judge Baxter's March 1, 2011 Report and Recommendation is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** in its entirety; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.
Johnson v. Fernandez
Not Reported in F.Supp.2d, 2012 WL 1033652 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
Jan. 24, 1994.

MEMORANDUM AND ORDER

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an in-
mate then in confinement at the Federal Correction-
al Institution in Otisville, New York ("Otisville"),
filed this action for injunctive relief and damages
based upon alleged violations of his rights under
the United States Constitution, Amendments I, IV,
V, VI, IX, and XIII, and upon violations of various
laws and/or regulations governing prison adminis-
tration.[FN1] The Complaint named as defendants
G.L. Hershberger ("Hershberger"), the United
States Attorney General ("Attorney General"), Gary
Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith
("Keith"), the Bureau of Prisons ("BOP"), and the
Otisville Medical Department ("OTV Medical De-
partment") (collectively "Defendants"). Defendants
moved for judgment on the pleadings pursuant to
Rule 12(c) of the Federal Rules of Civil Procedure,
or, in the alternative, for summary judgment pursu-
ant to Rule 56 of the Federal Rules of Civil Proced-
ure. For the reasons set out below, Defendants' Rule
12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Com-
plaint, pursuant to Rule 12(c) of the Federal Rules
of Civil Procedure, for failure to state a claim upon
which relief can be granted. Rule 12(c) provides:

After the pleadings are closed but within such
time as not to delay the trial, any party may move
for judgment on the pleadings. If, on a motion for
judgment on the pleadings, matters outside the
pleadings are presented to and not excluded by
the court, the motion shall be treated as one for
summary judgment and disposed of as provided
in Rule 56, and all parties shall be given reason-
able opportunity to present all material made per-
tinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that
are employed for dismissing a complaint for failure
to state a claim under Fed.R.Civ.P. 12(b)(6) are ap-
plicable" to a Rule 12(c) motion to dismiss for fail-
ure to state a claim upon which relief can be gran-
ted. *See Ad–Hoc Comm. of the Baruch Black &
Hispanic Alumni Ass'n v. Bernard M. Baruch Col-
lege,* 835 F.2d 980, 982 (2d Cir.1987); *see also Vi-
acom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992);* 5A Charles Wright and Ar-
thur R. Miller, *Federal Practice and Procedure* ¶
1367, at 515–16 (1990). Thus, the Court must read
the Complaint generously, drawing all reasonable
inferences from the complainant's allegations. *See
California Motor Transp. v. Trucking Unlimited,*
404 U.S. 508, 515 (1972). Moreover,
"consideration is limited to the factual allegations
in [the] amended complaint, which are accepted as
true, to documents attached to the complaint as an
exhibit or incorporated in it by reference, to matters
of which judicial notice may be taken, or to docu-
ments either in plaintiff['s] possession or of which
plaintiff[ ] had knowledge and relied on in bringing
suit." *Brass v. American Film Technologies, Inc.,*
987 F.2d 142 (2d Cir.1993); *accord Allen v. West-
point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d
Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112
S.Ct. 1561 (1992); *Frazier v. General Elec. Co.,*
930 F.2d 1004, 1007 (2d Cir.1991). Defendants,
therefore, are entitled to dismissal for failure to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

state a claim only if the Court finds beyond a doubt that "plaintiff can prove no set of facts" to support the claim that plaintiff is entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

## II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

## III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint

must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

> FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

> FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.
Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5129102 (W.D.N.Y.)
**(Cite as: 2010 WL 5129102 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.
Herbert LONG, Plaintiff,
v.
Karen CROWLEY, et al., Defendants.

No. 09–CV–456LGF.
Dec. 10, 2010.

Herbert Long, Dannemora, NY, pro se.

David Joseph State, NYS Attorney General's Office, Buffalo, NY, for Defendants.

*DECISION AND ORDER*
DAVID G. LARIMER, District Judge.

**\*1** On August 25, 2010, this Court issued a Decision and Order dismissing plaintiff's claims against, inter alia, Robert K. Kirkpatrick ("Kirkpatrick"), Norman Bezio ("Bezio"), and Brian Fischer ("Fischer"), with prejudice. (Dkt. # 13). On September 3, 2010, the plaintiff filed a motion for amendment of that Decision and Order pursuant to Fed. R. Civ. Proc. 59 (Dkt.# 14).

A court may reconsider its previous ruling if: "(1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent obvious injustice." *U.S. v. Billini*, 2006 WL 3457834 at \*1 (S.D.N.Y.2006). "New evidence" is evidence that was unavailable to the movant when the Court made its previous ruling, and that could not have been found by due diligence. *See Frankel v. City of New York*, 2009 WL 4037818 at \*1 (S.D.N.Y.2009) *. See also Hines v. Overstock.com, Inc.*, 380 Fed Appx. 22, 25 (2d Cir.2010). A motion for reconsid-

eration or amendment is not an opportunity to reargue issues already decided. *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995).

The Court dismissed plaintiff's due process claims against Kirkpatrick, Fischer and Bezio, on the grounds that plaintiff failed to allege their personal involvement in the alleged violations. (Dkt. # 13 at 6–7). Plaintiff's only allegation against Bezio is that he affirmed a disciplinary sanction issued to plaintiff upon plaintiff's administrative appeal. *See e.g., Woodward v. Mullah*, 2009 WL 4730309 at \*2–\*3 (W.D.N.Y.2009) (Report and Recommendation of McCarthy, M.J., adopted by Arcara, D.J.). As the Court discussed in detail in its initial Decision and Order (Dkt.# 13), where the only allegation against a defendant is that he affirmed a disciplinary hearing determination on appeal (as opposed to participating in a proactive review of the administrative process), such an allegation is insufficient to state personal involvement by that defendant.

With respect to Fischer and Kirkpatrick, plaintiff merely alleges that he wrote letters notifying them of the matter. Again, their mere receipt of letters protesting unconstitutional conduct is insufficient to allege personal involvement on their part, or to create liability under Section 1983. *See e.g., Gayle v. Lucas*, 1998 WL 148416 at \*4 (S.D.N.Y.1998). *See also Watson v. McGinnis*, 964 F.Supp. 127 (S.D.N.Y.1997) ("[t]he law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability").

Plaintiff's instant motion provides copies of his letters to Fischer, the content and mailing of which was not in question, and Bezio's one-sentence affirmance of the outcome of plaintiff's disciplinary hearing, which further supports the Court's initial conclusion that Bezio's affirmance was a "rubber-stamping" of the underlying determination, and not a "proactive review" sufficient to form the basis for Section 1983 liability. Plaintiff has presented no new facts or law that would alter the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

outcome of the Court's initial determination or require amendment of its August 25, 2010 Decision and Order. Accordingly, his motion to alter or amend that Decision (Dkt.# 14) is denied.

**\*2** On or about November 22, 2010, Long mailed correspondence to the Court which further requested reconsideration of the dismissal of defendants Sandra Williams ("Williams") and Anthony Bator ("Bator"), who plaintiff alleges made false statements against him concerning the tangential matter of plaintiff's reasons for not attending a disciplinary hearing. I have considered the facts highlighted by plaintiff therein, which generally restate the factual allegations he made against Williams and Bator in his amended complaint, and see no reason to disturb the prior holding with respect to those defendants. Williams and Bator did not initiate the disciplinary action against plaintiff, and thus his constitutional due process rights are not implicated by their allegedly false testimony concerning the collateral matter of his non-attendance at the hearing. *See generally Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) (an inmate has no constitutionally-protected right against being falsely accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process). To the extent that Long's letter may be deemed a second or supplemental motion for reconsideration, it is likewise denied.

IT IS SO ORDERED.

W.D.N.Y.,2010.
Long v. Crowley
Not Reported in F.Supp.2d, 2010 WL 5129102 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2013 WL 5603870 (W.D.N.Y.)
**(Cite as: 2013 WL 5603870 (W.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Detroy LIVINGSTON, Plaintiff,
v.
James ESCROW, G. Harvey, Keith Dubray, Willi-
am Bills, John Doe, Glenn Goord, Renee Gates,
N.R. Whitten, Defendants.

No. 08–CV–6576–FPG.
Oct. 11, 2013.

Detroy Livingston, Stormville, NY, pro se.

J. Richard Benitez, Nys Attorney General's Office,
Department of Law, Rochester, NY, for Defend-
ants.

DECISION & ORDER

FRANK P. GERACI, JR., District Judge.

**I. INTRODUCTION**

**\*1** *Pro se* Plaintiff Detroy Livingston, an in-
mate in the custody of the New York. State Depart-
ment of Corrections and Community Supervision
("DOCCS"), commenced this action pursuant to 42
U.S.C. § 1983 alleging that Defendants FN1 James
Escrow ("Escrow"), G. Harvey ("Harvey"), Keith
Dubray ("Dubray"), Wiitiam Bills ("Bills"), John
Doe ("Doe"), Glenn Goord ("Goord"), Renee Gates
("Gates") and N.R. Whitten ("Whitten"), violated
his civil rights by denying him due process and ac-
cess to the courts. Dkt. # 82. The Amended Com-
plaint was filed against these Defendants in their
individual capacity. *Id.*

> FN1. Defendants New York State Depart-
> ment of Correctional Services, Janet
> Gauge, Brian Fischer, Karol B, Magnum,
> Leonard Joblove and Charles J. Hynes
> have been previously dismissed from this
> action. Dkt.# 3, 82, 128.

Pursuant to Rule 56 of the Federal Rules of
Civil Procedure, Defendant Goord has moved this
Court for an order granting summary judgment in
his favor on the grounds that the Complaint fails to
state a claim upon which relief can be granted, and
he was not personally involved in the alleged
deprivation of access to the courts, the sole allega-
tion against him. Dkt. # 143. Plaintiff filed his No-
tice of Opposition to Motion for Summary Judg-
ment ("Pl.'s Opp'n"), including his Affidavit in
Support of Opposition to Motion for Summary
Judgment ("Pl.'s. Opp'n Aff") and his Memorandum
of Law ("Pl.'s Mem."). Dkt. # 149. By letter request
Defendant's attorney asked the Court to consider
the Declaration ("Benitez Decl.") filed on Septem-
ber 26, 2013 (Dkt.# 147) as a reply and in support
of Goord's summary judgment motion.

This case was assigned to this Court on January
15, 2013. Dkt. # 123. Pursuant to this Court's Pre-
trial Order of May 9, 2013, a jury trial of this mat-
ter has been scheduled to commence on October 21,
2013 at 8:30 A.M. Dkt. # 133.

**II. BACKGROUND**

According to his Amended Complaint, Plaintiff
was in the custody of the New York State Depart-
ment of Correctional Services ("DOCS"), prede-
cessor to the New York State Department of Cor-
rections and Community Supervision ("DOCCS"),
and incarcerated at the Elmira Correctional Facility
("Elmira") at the time the complained of acts oc-
curred. Plaintiff alleges that in July 2006, he was
transferred to Auburn Correctional Facility
("Auburn") to attend to a lost property action he
was pursuing in the New York Court of Claims and
while he was away in Auburn, the Elmira mailroom
staff held his mail. Upon Plaintiff's return to
Elmira, on August 17, 2006, the mailroom staff de-
livered to him the accumulated mail which included
a letter dated July 26, 2006 and addressed to
Plaintiff from the New York State Court of Appeals
("Court of Appeals") regarding Plaintiffs applica-
tion for a writ of *error coram nobis.* The Court of

Slip Copy, 2013 WL 5603870 (W.D.N.Y.)
**(Cite as: 2013 WL 5603870 (W.D.N.Y.))**

Appeals' letter informed Plaintiff that any additional submissions in the application for a certificate permitting a further appeal must be mailed within three weeks after the date of the letter, with a copy served on the adverse party. This letter also requested that "[p]articular written attention should be given to identifying reviewability and preservation issues (Rules of Practice, § 500.20[a] )."

**\*2** Pursuant to the Amended Complaint, by the conduct of the mailroom staff in holding the mail until August 17, 2006, Plaintiff missed the filing deadline set by the Court of Appeals, and his application was dismissed on the August 17, 2006, the same date on which mailroom staff delivered to him the letter from the Court of Appeals. Plaintiff alleges in the Amended Complaint that the mailroom staff withheld his mail to intentionally deprive Plaintiff of his right to access the courts.

As to Goord, who is alleged to have been employed by DOCS as the Commissioner during the relevant period (Dkt. # 82 ¶ 6), the Amended Complaint states that he wrongfully maintained policies, procedures and customs which deprived Plaintiff of his constitutional rights, violated his right of access to the courts, and resulted in the dismissal of his appeal to the Court of Appeals (Dkt. # 82 ¶ 48). On this motion for summary judgment, the Court is called upon to consider only the allegations against Goord.

## III. *DISCUSSION*

### A. Plaintiff's Opposition to the Timing of Defendant's Summary Judgment

Plaintiff asserts that Goord's motion for summary judgment must be dismissed as untimely under subdivision (b) of Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."), which governs the time to file such motions, and provides that "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." According to

Plaintiff, Goord filed his motion "beyond the allotted time limit." Dkt. # 149 at 4, ¶ 11. The Preliminary Statement of the Memorandum of Law in Support of Commissioner Goord's Motion for Summary Judgment ("Def.'s Mem.") (Dkt. # 143–2 at 1) states that Goord was not initially sued in this lawsuit (Dkt.# 1), but was added as a Defendant in 2011 (Dkt.81, 82) and answered the Amended Complaint on March 27, 2012 (Dkt.# 103). Thereafter, according to Def's Mem., and as borne out upon a review of district court records, the Court neither held a Rule 16 conference nor issued a scheduling order following Goord's addition as a Defendant. Regarding the summary judgment motion, this Court, on September 12, 2013, issued a Motion Scheduling Order & Notice to Pro Se Plaintiff ("Scheduling Order"), setting specific dates for the filing of Plaintiff's responding papers and for a reply, if any, by Defendant. Dkt # 144. By this Scheduling Order, the Court, in the interest of resolving any outstanding issues prior to a trial of this matter, and in accordance with Rule 56(b), effectively issued its order permitting Defendant's summary judgment motion to proceed on a different timetable. Plaintiff's request to dismiss this motion as untimely, therefore, is denied.

### B. Summary Judgment Standard

Pursuant to Rule 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it might affect the outcome of the suit under governing law." *Id.*

**\*3** Summary judgment is appropriate "[w]here the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, the Court's function in deciding a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

summary judgment motion is not "to weigh the evidence and determine the tmth of the matter, but to determine whether there is a genuine issue for trial." *Liberty Lobby, Inc.,* 477 U.S. at 249. When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250.

The Second Circuit offered guidance in the discernment of genuine issues of material fact, stating: "[i]n assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." *Duse v. International Business Machines Corp.,* 252 F.3d 151, 158 (2d Cir.2001) (citing *e.g., Liberty Lobby, Inc.,* 477 U.S. at 255). Although the district court must view the evidence in favor of the nonmoving party, " 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Liberty Lobby, Inc.,* 477 U.S. at 252) (internal alterations and emphasis omitted). Reliance by the nonmoving party on "conclusory allegations or unsubstantiated speculation" is insufficient to defeat a motion for summary judgment. *Id.* at 554 (quoting *Fujitsu Ltd. v. Federal Exp. Corp.,* 247 F.3d 423, 428 (2d Cir.2001).

Where, as in the present circumstances, the party opposing summary judgment is *pro se,* the Court must "read the pleadings ... liberally and interpret them to raise the strongest arguments that they suggest." *Morrison v. Parmele,* 892 F.Supp.2d 485, 487 (W.D.N.Y.2012) (quoting *Corcoran v. New York Power Authority,* 202 F.3d 530, 536 (2d Cir.1999)). This liberalized approach to *pro se* pleadings notwithstanding, "proceeding *pro se* does not otherwise relieve [opposing party] from the usual requirements of summary judgment." *Fitzpatrick v. N.Y. Cornell Hosp.,* No.

00–Civ.–8594 (LAP), 2002 U.S. Dist. LEXIS 25166, at *5 (S.D.N.Y. Jan. 9, 2003). *See also Stinson v. Sheriff's Dept. of Sullivan County,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the "liberal construction" accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

Plaintiff has alleged that Defendants violated his civil rights under 42 U.S.C. § 1983 which imposes civil liability upon any person who, under color of state law, subjects an individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 137 (2d Cir.1999). Because § 1983, itself, is not " 'a source of substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred,' " *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433, (1979)); *see Ramsey v. Goord,* 661 F.Supp.2d 370, 384 (W.D.N.Y.2009), it is imperative at the outset for a court to identify the specific constitutional right or rights alleged to have been violated. *Albright v. Oliver,* 510 U.S. at 271 ("The first step in any such claim is to identify the specific constitutional right allegedly infringed.") (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); and *Baker v. McCollan,* 443 U.S. at 140).

**\*4** The Amended Complaint in this case alleges violations by all Defendants, including Goord, of Plaintiff's civil rights under the First, Sixth, Eighth and the Fourteenth Amendments to the United States Constitution. Respecting Goord, the Amended Complaint specifically alleges that he (1) "upon information and belief ... was employed by DOCS as the commissioner at the time the acts about which Plaintiff now complains occurred" (Dkt. # 82 ¶ 6); and (2) "maintained, at all relevant times herein, policies, procedures and customs, which deprived Plaintiff of his constitutional rights,

his right of access to the court was violated, and his appeal to the Court of Appeals was dismissed" (*Id.* ¶ 48). Goord seeks summary judgment dismissing the action against him on the grounds that the Amended Complaint fails to state a claim upon which relief can be granted, and points to the lack of personal involvement on his part in the allegations of mail-withholding conduct.

## C. Denial of Access to the Courts

There is no disagreement that "[i]nterference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U .S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Courts have held that in order to state a § 1983 claim for denial of access to the courts, e.g., in a case involving interference with legal mail, a plaintiff must allege that the defendant "took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (citing *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)); *see also Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y.2001) ("[I]n order to survive a motion to dismiss, a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.") (citing *Lewis,* 518 U.S. at 353). Put another way, "the plaintiff must show that a 'non-frivolous legal claim had been frustrated or was being impeded' due to the actions of prison officials." *Cancel v. Goord,* 2001 WL 303713, at *4 (citing *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis,* 518 U.S. at 353); *see also Monsky v. Moraghan,* 127 F.3d at 247.

Construing the Amended Complaint and the other documents reviewable on a motion for summary judgment liberally, Plaintiff's allegations against Goord woefully lack any showing of deliberate and malicious conduct which resulted in actu-

al injury to Plaintiff by frustrating or impeding his pursuit of a non-frivolous legal claim. Plaintiff, in conclusory fashion, simply states that as a result of policies, procedures and customs maintained by Goord, he was deprived of his constitutional rights, his right of access to the court was violated, and his appeal to the Court of Appeals was dismissed. These allegations fall far short of demonstrating any deliberate and malicious conduct on Goord's part.

**\*5** Initially, Plaintiff's Amended Complaint focused on unnamed and unspecified policies, procedures and customs allegedly maintained by Goord as the sources of the alleged civil rights violations, but Plaintiff has now specified DOCS Directive # 4015 as the offending policy. Pl.'s. Opp'n Aff. ¶ 7; *See* Dkt. # 147 at 42, Ex. F). Most particularly, Plaintiff alleges that the Directive's policy and procedure mandating that the legal mail of an inmate on out-to-court status be held until his return to the facility,[FN2] unconstitutionally denied him access to the courts and, because of prior lawsuits involving other inmate complaints regarding withholding and delaying mail delivery, Goord was actually or inferentially aware that his constitutional right to access the courts was being violated thereby. He cites two cases, in paiticular, as examples of such lawsuits giving notice of constitutional violations: *Davis v. Goord,* 320 F.3d 346 (2d Cir.2003) (holding that although allegations in *pro se* inmate's civil rights complaint that prison officials on two occasions opened his legal mail outside of his presence were insufficient to state a claim for denial of access to the court or a violation of free speech, district court should have granted him leave to amend the complaint to attempt to allege an actual injury) and *Davidson v. Scully,* 694 F.2d 50 (2d Cir.1982) (reversing a district court's dismissal of inmate's complaint protesting prison regulations permitting the opening of all outgoing mail on the ground that as applied to the correspondence in question, such prison regulations were irrational). Neither of the cases upon which Plaintiff relies raised or addressed any constitution-

al violation of an inmate's civil rights resulting from DOCS Directive # 4015. Having documented Plaintiffs return to Elmira on August 2, 2006 from out-to-court status (Dkt.# 147, Ex. G) and provided copies of Legal/Privileged Mail Acknowledgment of Receipt Logs for the period July 26, 2006 to August 31, 2006 (Dkt.147, Ex, H), which clearly show that Plaintiff signed for legal mail on August 11, 2006, August 15, 2006, August 17, 2006, August 25, 2006, August 28, 2006, August 30, 2006 and August 31, 2006, Defendant has sufficiently demonstrated that the out-of-court policy set forth in DOCS Directive # 4015 is not implicated in the instant circumstances.

> FN2. The pertinent provision of DOCS Directive # 4015 states in Section (IV)(B)(3)(a): " 'Out–to–Court' ": "The Correspondence Unit, upon notification via the facility 'Change Sheet' placing an inmate on out-to-court status, shall hold all mail received for that inmate until such time as: the inmate returns from court."

Nowhere in the Amended Complaint, or in any of the pleadings, papers opposing this motion, interrogatories, affidavits or other pertinent submissions, is mere any attempt by Plaintiff to show, or even address, the merits of the application for leave to appeal the Appellate Division, Second Department's denial of the writ of *error coram nobis* or, likewise, the merits of any supplemental information or documentation that he would have submitted, but for the alleged delayed delivery of the mail. Indeed, Plaintiff has never specifically referred to, or identified the exact nature or content of any additional information, merit-based or otherwise, which he would have submitted to the Court of Appeals in support of his leave application.

**\*6** In denying Plaintiff's application for leave to appeal the Appellate Division, Second Department's denial of Plaintiff's application for a writ of *error coram nobis,* the Court of Appeals articulated its reason therefor: "upon the record and the proceedings herein, there is no question of law presen-

ted which ought to be reviewed." By no interpretation of the allegations in the Amended Complaint is it reasonable to conclude that the Court of Appeals' discretionary decision to deny Plaintiff's appeal derived from Plaintiff's failure to submit additional supportive materials within the required timeframe outlined in the letter, rather than the absence of a cognizable question of law. Even assuming Goord maintained the complained of policies, procedures and customs which Plaintiff claims interfered with the delivery of his mail, Plaintiff has failed to establish that he suffered an actual injury, i.e., that Goord frustrated or impeded Plaintiff's pursuit of a "non-frivolous legal claim." Plaintiff has failed to state a claim against Goord for denial of access to the courts.

**D. Personal Involvement**

Defendant Goord contends that he cannot be found to be personally liable in this case and is entitled to summary judgment because he was not personally involved in any constitutional violation. Personal involvement is a prerequisite for the assessment of damages in a § 1983 action against a supervisory official in his individual capacity. *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010); *Farrell v. Burke,* 449 F.3d 496, 501 (2d Cir.1994). Personal involvement of a supervisory defendant may be demonstrated by evidence that the defendant: (1) directly participated in the alleged violation; (2) failed to remedy the wrong after being informed of the violation through a report or an appeal; (3) created a policy or custom under which unconstitutional practices occurred or were permitted to continue; (4) was grossly negligent in supervising the subordinates who committed wrongful acts; or (5) exhibited deliberate indifference to inmates' rights by failing to act on information indicating that unconstitutional acts were occurring.FN3 *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *see Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986). Under the *Colon* analysis, "The mere fact of supervisory authority, however, is insufficient to demonstrate liability, based on a failure to supervise, under § 1983." *Id.* at 874; *Ramsey v.*

*Goord,* 661 F.Supp.2d at 385.

FN3. The Court is aware that at least one New York district court has held that the Supreme Court, in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868(2009), eliminated most of the *Colon* factors (citing *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009)* ("Only the first and part of the third *Colon* Categories pass *Iqbal* 's muster ... The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated.") *Gruilon v. City of New Haven,* 720 F.3d 133 (2d Cir.2013), decided by the Second Circuit on June 19, 2013, cited all five factors set out in *Colon v. Coughlin* and, further, referenced the Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), indicating that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain violations." The Second Circuit was not presented with proper facts in *Grullon* to rule on *Iqbal* 's significance and has not explicitly recognized the split among the district courts over whether all five of the *Colon* Factors are still applicable. *See Liner v. Fischer,* 2013 WL 3168660, at *7+(S.D.N.Y. June 24, 2013)* (summarizing the state of the law in this Circuit regarding how many of the *Colon* factors survive in the wake of *Iqbal,* and agreeing with the "majority view" that where the constitutional claim does not require a showing of discriminatory intent, the personal-involvement analysis in *Colon* should still apply); *see also, Wik v. Kunego,* 2012 WL 4801038, at *3, n. 3 (W.D.N.Y.2012); *Stresing v. Agostmoni,* 2012 WL 2405240, at *4 (W.D.N.Y.2012).

Even viewing his allegations favorably under

an analysis of the *Colon* criteria, Plaintiff has failed to establish evidence on which the jury could reasonably find for him on the issue of Goord's personal involvement in the alleged deprivation of his rights. In this regard, nothing in the record demonstrates that Goord directly participated in the denial of Plaintiff s right of access to the courts, nor is there any evidence in the record from which to conclude the existence of any of the remaining *Colon* categories. To this point, Plaintiff's First Set of Interrogatories propounded to Goord addressed other issues, such as the relationship and communications between Elmira staff and the Kings County District Attorney's Office, but did not seek to solicit information relative to the Amended Complaint's allegations against Goord. Dkt. # 116.

**\*7** Finally, Defendant points to the responses of Mailroom Supervisor William Bills, also a Defendant in this action, to Plaintiff's First Set of Interrogatories to Defendants ("Bills Response"), declared on January 14, 2010 and filed on January 15, 2010 (Dkt.# 34), as further evidence of the lack of Goord's personal involvement and, importantly, as also demonstrating the absence of delay in mail delivery to Plaintiff, despite the presence of the private "Pitney Bowes" postage stamp of July 26, 2006 on the envelope containing the Court of Appeals' letter. Specifically, Defendant enumerated the following interrogatories and the respective responses:

6. Why wasn't the July 26, 2006 legal mail from the NYS Court of Appeals delivered to Plaintiff on August 11, 2006 or August 15, 2006 when other legal mail that were being held for his return from the court trip was delivered to him before August 17, 2006 date?

**RESPONSE:** The mail in question was received in the Elmira correspondence office on August 17, 2006 and delivered on the same date.

23. The July 26, 2006 legal mail from the NYS Court of Appeals was postmarked on the same date, but was stamped by Elmira C.F. corres-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

pondence office on August 17, 2006 the date that it was delivered to Plaintiff, 23 days after the letter was mailed. What does this timeline say to you?

**RESPONSE:** The mail in question was received at Elmira on August 17, 2006. I will not speculate why.

Plaintiffs conclusory and speculative allegations regarding Goord's personal involvement in the alleged denial of his right to access the courts do not create an issue of material fact for trial such that a reasonable and rational trier of fact could find in his favor. Summary judgment in favor of Goord is warranted.

## IV. CONCLUSION

Defendant's motion for partial summary judgment dismissing the claims set forth in the Amended Complaint against Goord is granted. The Clerk of the Court is hereby ordered to remove Goord as a Defendant in this action. Furthermore, the jury trial scheduled on October 21, 2013 at 8:30 A.M. shall proceed against Defendants Escrow, Harvey, DuBray, Bills, Doe, Gates and Whitten on the claims set forth against them in the Amended Complaint.

IT IS SO ORDERED.

W.D.N.Y.,2013.
Livingston v. Escrow
Slip Copy, 2013 WL 5603870 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

C Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
No. 97-CV-1385 LEK DRH.

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments. FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver, 82 F.3d 63, 67 (3d Cir.1996)*. While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord, 992 F.Supp. 604, 627 (S.D.N.Y.1998)*. The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn, 110 F.3d 520, 524 (7th Cir.1997)*).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio, 968 F.Supp. 193, 198 (D.N.J.1997)* (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996)* (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray, 761 F.Supp. 409, 415 (E.D.Va.1990)* (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)*. The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir.1998)*. Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer, 511 U.S. at 834.*

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996).*

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer, 511 U.S. at 837.* Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that there is a significant risk of serious injury to that prisoner.*" *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v., Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *See id.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id. Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See, e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See *Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See*Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See*Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.FN9

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jason A. KETCHUCK, Plaintiff,
v.
Brad A. BOYER, Defendant.
No. 3:10–CV–870 (TJM / DEP).

Oct. 25, 2011.
Jason A. Ketchuck, Endicott, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Albany,
NY, for Defendant.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

## I. INTRODUCTION

*1 Plaintiff Jason A. Ketchuck commenced this action
*pro se* asserting claims of false arrest, malicious
prosecution, and abuse of process pursuant to 42 U.S.C. §
1983. *See* Compl., dkt. # 1. Defendant moves for summary
judgment seeking to dismiss the action in its entirety. *See*
Motion, dkt. # 15. In opposition, Plaintiff filed only
affidavits from himself and his father. *See* Opp., dkt. #
18.[FN1] Defendant has filed a reply. *See* Reply, dkt. # 19.
The Court has determined to decide the motion based
upon the submissions alone. *See* N.D.N.Y.L.R. 7.1(h) ("In
the district court judge's discretion ..., the district court
judge may dispose of a motion without oral argument.
Thus, the parties should be prepared to have their motion
papers serve as the sole method of argument on the
motion.").

> FN1. Plaintiff was served with the Northern
> District's standard summary judgment
> notification for *pro se* litigants, *see* dkt. # 15–1.
> This notification provided, *inter alia*,
>
> Pursuant to Local Rule 7.1 of the Northern
> District of New York, you are required to

submit the following papers in opposition to
this motion: (I) a memorandum of law
(containing relevant factual and legal
argument); (ii) one or more affidavits in
opposition to the motion and (iii) a short and
concise statement of material facts as to which
you claim there are genuine issues in dispute.
These papers must be filed and served in
accordance with the time set by Local Rule
7.1.

If you do not submit a short and concise
statement of material facts as to which you
claim there are genuine issues in dispute, all
material facts set forth in the statement filed
and served by the defendant(s) shall be
deemed admitted.

## II. STANDARD OF REVIEW

The Court may grant summary judgment where "there
is no genuine dispute as to any material fact and the
movant is entitled to a judgment as a matter of law." FED.
R. CIV. P. 56(a). A dispute is genuine if the relevant
evidence is such that a reasonable jury could return a
verdict for the nonmoving party. *Anderson v. Liberty
Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d
202 (1986). A party seeking summary judgment bears the
burden of informing the court of the basis for the motion
and of identifying those portions of the record that the
moving party believes demonstrate the absence of a
genuine issue of material fact as to a dispositive issue.
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct.
2548, 91 L.Ed.2d 265 (1986).

If the movant is able to establish a *prima facie* basis
for summary judgment, the burden of production shifts to
the party opposing summary judgment who must produce
evidence establishing the existence of a factual dispute
that a reasonable jury could resolve in his favor.
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475
U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
The nonmoving party must show, by affidavits or other
evidence, admissible in form, that there are specific factual

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment." *Viscusi v. Proctor & Gamble,* 2007 WL 2071546, at * 9 (E.D.N.Y. July 16, 2007).

In determining whether to grant summary judgment, the Court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita.,* 475 U.S. at 586, or by a factual argument based on "conjecture or surmise." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).

**\*2** The Local Rules of the Northern District require a party moving for summary judgment to submit a "Statement of Material Facts" which sets forth, with citations to the record, each material fact about which the moving party contends there exists no genuine issue. N.D.N.Y.L.R. 7.1(a)(3). Once a properly supported Local Rule 7.1(a)(3) Statement is submitted, the party opposing the motion must

> file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

*Id.* (underscoring in original).

The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly. *See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648–49 (2d Cir.2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a) (3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (*per curiam* ) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.,* 103 F.Supp.2d 104, 108 (N.D.N.Y.2000) (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations—specific or otherwise—to the record") (emphasis in original); *McKnight v. Dormitory Auth. of State of N.Y.,* 189 F.R.D. 225, 227 (N.D.N.Y.1999) (McAvoy, J.) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County,* 47 F.Supp.4 311, 317 (N.D.N.Y.1999) (McAvoy, J.) (deeming admitted all facts in defendants' Rule 7.1(a) (3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record").

While the Court must construe a *pro se* litigant's pleadings and papers liberally and interpret them to raise the strongest arguments that they suggest, *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003); [FN2] *Veloz v. New York,* 339 F.Supp.4 505, 513 (S.D.N.Y.2004), the application of this lenient standard does not relieve a *pro se* litigant of the requirement to follow the procedural formalities of Local Rule 7.1(a)(3). *Govan,* 289 F.Supp.2d at 295; *see also Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. INS,* 59 F.3d 5, 8 (2nd Cir.1995) ("While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

generally are required to inform themselves regarding procedural rules and to comply with them.").

> FN2. To construe pleadings liberally means the Court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan,* 289 F.Supp.2d at 295.

## III. BACKGROUND

**\*3** Because Plaintiff has not submitted an opposing Statement of Material Facts, the properly supported facts set forth in Defendant's Statement of Material Facts are deemed admitted for purposes of this motion. N.D.N.Y.L.R. 7.1(a)(3). Except where indicated otherwise, the following facts are taken from Defendant's Statement of Material Facts.

Defendant Brad A. Boyer is a uniformed New York State Trooper assigned to the Owego Barracks of Troop C of the New York State Police, headquartered in Sidney, New York. On October 22, 2008, he responded to a call from an individual named Carol A Smith who complained that Plaintiff Jason Ketchuck, one of the sons of her next door neighbor, had repeatedly driven his vehicle through her yard, and that the most recent occasion on which this had occurred was at approximately 7:38 AM on October 22, 2008. She complained that this course of conduct had caused rutting and damage to her front lawn.

Upon responding to the call, Trooper Boyer observed the rutting and damage to Ms. Smith's lawn alongside the roadway in front of her house, and took a series of photographs of the lawn. Trooper Boyer took a sworn statement from Ms. Smith on October 22, 2008, and she signed a Complaint against Jason A. Ketchuck on the same date accusing him of Trespass, in violation of New York Penal Law § 140.05. Based upon the information provided by Ms. Smith and the property damage that he observed and photographed on October 22, 2008, Trooper Boyer also prepared and signed an Information charging Jason A. Ketchuck with Criminal Mischief in the Fourth Degree.

On October 31, 2008, Trooper Boyer requested that Plaintiff come to the Owego Barracks to meet with him

concerning Ms. Smith's complaint, which he did. Mr. Ketchuck admitted that he had been the driver of the small grey car on the date and time that had been the subject of Ms. Smith's complaint; however, he denied that he had driven the car on her lawn. Mr. Ketchuck also contended that the ruts near the road were on property that was abandoned by the Town of Owego in 1934 and that, although Ms. Smith "extended the landscaping of her property onto the abandoned road without the Town's permission" seven (7)years prior, his father was claiming ownership of this property in a quite title action in New York State Supreme Court. Jason Ketchuck Aff., ¶ 9; *see* James Ketchuck Aff., ¶¶ 2, 8. Ketchuck's father also contends that, prior to charges being levied against his son, he met with Trooper Boyer and attempted to show Trooper Boyer "property maps, surveys, deeds, and town records which set forth the property lines and boundaries of the property owned by [Ms.] Smith," but Trooper Boyer "refused to look at them." James Ketchuck Aff., ¶¶ 6–7.

Trooper Boyer issued Plaintiff an appearance ticket charging him with Trespass in violation of Penal Law § 140.05 and Criminal Mischief in the Fourth Degree in violation of Penal Law § 145. After issuing the appearance ticket to Jason A. Ketchuck on October 31, 2008, Trooper Boyer did not have any further involvement in the prosecution of this case. The charges were Dismissed in the Interest of Justice in the Owego Town Court on May 27, 2009.

## IV. DISCUSSION

### a. False Arrest

**\*4** Plaintiff claims that he was falsely arrested by Defendant. A false arrest claim, whether brought under federal or state law,[FN3] will fail if, at the time of the seizure, the arresting officer had probable cause to make an arrest. *Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir.2003); *Smith v. Edwards,* 175 F.3d 99, 105 (2d Cir.1999); *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996); *see Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006) ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim."). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

known to the arresting officer at the time of the arrest." *Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 593, 160 L.Ed.2d 537 (2004) (citing *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)).

> FN3. Plaintiff asserts claims only under federal law pursuant to 42 U.S.C. § 1983. However, given Plaintiff's *pro se* status, the Court examines the potential supplemental state law claims that might be asserted.

"Probable cause exists if at the time of the arrest 'the facts and circumstances within th[e officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Amore v. Novarro,* 624 F.3d 522, 536 (2d Cir.2010 (citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)); *see Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999). The relevant inquiry is whether "probable cause existed to arrest a defendant" and "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly,* 439 F.3d at 154; *see Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (probable cause to arrest can exist even if offense relied upon is not even "closely related" to offense charged). "A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." *Hahn v. County of Otsego,* 820 F.Supp. 54, 55 (N.D.N.Y.1993), *aff'd,* 52 F.3d 310 (2d Cir.1995). "[T]he eventual disposition of the criminal charges is irrelevant to the probable cause determination." *Hahn,* 820 F.Supp. at 55 (citing *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)).

"It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (quoting *Miroslavsky v. AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd* 993 F.2d 1534 (2d Cir.1993)). "If policemen arrest a person on the basis

of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable ... merely because it later turns out that the complaint was unfounded." *Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997); *see Calderola v. Calabrese,* 298 F.3d 156, 165 (2d Cir.2002) ("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that might not be the case."). Once a police officer has probable cause, he need not explore "every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997); *see Coons v. Casabella,* 284 F.3d 437, 441 (2d Cir.2002) ("[P]olice officers are not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."); *Hotaling v. LaPlante,* 67 F.Supp.2d 517, 522 (N.D.N.Y.2001) (valid probable cause to arrest rested upon information supplied by an identified witness, and even though a further investigation by the Trooper would have led to a contradictory conclusion, Trooper's conduct was not unreasonable under the circumstances).

**\*5** Where the facts surrounding the arrest are uncontroverted, the determination as to whether probable cause existed may be made by the Court as a matter of law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Even where factual disputes exist, a § 1983 claim may fail if the plaintiff's version of events is sufficient to establish probable cause to arrest. *Mistretta v. Prokesch,* 5 F.Supp.2d 128, 133 (E.D.N.Y.1998).

Here, the alleged victim provided Defendant with a sworn statement that Plaintiff repeatedly drove his vehicle over a portion of her lawn causing damage to it. The victim's statement was corroborated by the tire marks and the ruts in the lawn which Defendant observed and photographed; and by Plaintiff's admission that he was the driver of the car alleged to have caused damage to the lawn. These facts provided more than ample probable cause for Defendant to believe that Plaintiff committed the offense of Trespass under Section 140.05 of the New York Penal Law.FN4 In this regard, the facts provided probable cause to believe that Plaintiff had intentionally driven his car across Ms. Smith's lawn on October 22, 2008; that she

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

did not consent to his doing so; and that Plaintiff's conduct on his neighbor's property, which had caused observable damage to the lawn, was not conduct that Plaintiff was licensed or privileged to engage in. *See Caidor v. Harrington,* 2009 WL 174958 (N.D.N.Y.2009) (Suddaby, J.) (granting summary judgment dismissing § 1983 false arrest claim based on arrest for violation of P.L. § 140.05). Moreover, these same facts provided ample probable cause to believe that Plaintiff had committed the offense of Criminal Mischief in the Fourth Degree in violation of N.Y. Penal Law § 145 [FN5] in that the facts, including the allegation that Plaintiff's car was repeatedly driven on the lawn, provided probable cause to believe that Plaintiff intentionally damaged Ms. Smith's property by driving his car on it.

> FN4. Section 140.05 of New York Penal Law provides that "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises. Trespass is a violation." "Premises" is defined to include any "building" or "real property." Penal Law 140.00(1). Penal Law § 140.00(5) provides that a person "enters or remain(s) unlawfully upon premises when he is not licensed or privileged to do so."

> FN5. In relevant part, Penal Law § 145 provides:

> A person is guilty of criminal mischief in the fourth degree when, having no right to do so nor any reasonable ground to believe that he or she has such right, he or she:

> 1. Intentionally damages property of another person[.]

> "While no statutory definition of 'damages' is provided, it is commonly recognized that the term contemplates 'injury or harm to property that lowers its value or involves loss of efficiency' and that only 'slight' damage must be proved" to establish a violation of Penal Law § 145. *People v. Collins,* 288 A.D.2d 756, 758, 733 N.Y.S.2d 289 (3d Dept.2001).

Because a police officer need not explore every

theoretically plausible claim of innocence before making an arrest, and because the existence of probable cause is determined by a standard far less burdensome than determining guilt, Defendant's probable cause determination is not negatively affected by Plaintiff's assertion of innocence or by Plaintiff's failure to review the property maps or surveys.[FN6] A police officer is not required to conduct an investigation if the facts demonstrate that probable cause exists that an offense has been committed. Accordingly, Defendant was not required to conduct independent research into who actually owned the property claimed by Ms. Smith as her front lawn before issuing the appearance ticket. This is especially so in light of the undisputed facts that the tire marks were on property abutting Ms. Smith's front lawn and on a piece of property over which Ms. Smith purportedly "extended the landscaping of her property" some seven (7) years prior to the incident. These facts provided reasonable corroboration for Ms. Smith's sworn statement that the tire marks and ruts were on her property.

> FN6. Defendant denies that the purported property dispute regarding the subject portion of Ms. Smith's front yard was ever articulated to him. Regardless, even if a property dispute regarding the subject property was articulated to Defendant, he was not required to a perform a title search or make additional inquiry to resolve the dispute in light of the sworn statement by Ms. Smith that the property in question belonged to her.

**\*6** Even assuming, *arguendo,* that actual probable cause did not exist to satisfy the demands of the Fourth Amendment, arguable probable cause existed such to entitle Defendant to qualified immunity. *See Zellner v. Summerlin,* 494 F.3d 344, 369–70 (2d Cir.2007) (discussing "arguable probable cause" as basis for qualified immunity). Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Amore,* 624 F.3d at 536 (citing *Walczyk v. Rio,* 496 F.3d 139, 163 (2d Cir.2007)). To determine whether an officer had arguable probable cause, the objective information he possessed at the time

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

of the arrest is examined, not the "subjective intent, motives or beliefs" of the officer. *Id.* Here, the information Defendant possessed at the time he issued the appearance ticket provided an objectively reasonable basis for him to believe that probable cause existed for the two offenses with which Plaintiff was charged. Accordingly, Defendant is entitled to qualified immunity on the false arrest claim because it was objectively reasonable for him to believe that his acts did not violate Plaintiff's clearly established rights under the Fourth Amendment. *Id.* at 530 ( [Q]ualified immunity ... is sufficient to shield executive employees from civil liability under § 1983 if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable [for them] to believe that their acts did not violate these clearly established rights."). For these reasons, the false arrest claim is dismissed.

**b. Malicious Prosecution**

Based on the undisputed facts that supplied Defendant with actual probable cause to believe that Plaintiff committed the two offenses for which he was charged, the malicious prosecution claim also fails as a matter of law. *See Rohman v. New York City Transit Auth.,* 215 F.3d 208, 215 (2d Cir.2000) (an element of a malicious prosecution claim is that the defendant lacked probable cause to believe the proceeding could succeed).

Moreover, to state a claim for malicious prosecution under either § 1983 or New York state common law, Plaintiff must establish, *inter alia,* "termination of the proceeding in [the accused's] favor." *Green v. Mattingly,* 585 F.3d 97, 104 (2d Cir.2009). Whether termination is deemed favorable to the accused is determined in accordance with applicable state law, here, New York law. *Hygh v. Jacobs,* 961 F.2d 359, 367 (2d Cir.1992). Proceedings are "terminated in favor of the accused" when their final disposition is such as to indicate the accused is not guilty. *DiBlasio v. City of New York,* 102 F.3d 654, 657 (2d Cir.1996). "Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." *Fulton v. Robinson,* 289 F.3d 188, 196 (2d Cir.2002). A dismissal "in the interest of justice" under New York Criminal Procedure Law § 170.40 "cannot provide the favorable termination required

as the basis for a claim of malicious prosecution." *Hygh,* 961 F.2d at 368 (citing *Ryan v. N.Y. Tel. Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487, 493 (1984)). Thus, Plaintiff cannot establish the "favorable termination" element of his malicious prosecution claim.

**\*7** Further, the undisputed facts are that Trooper Boyer never had any prior contact with either Mr. Ketchuck or Ms. Smith before this incident. He attested that he harbored no improper motive in instituting the charges, and that he issued the appearance ticket and filed the accusatory instruments in the Town Court only because of his good faith belief that there was the probable cause to pursue such charges. *See* Boyer Aff. ¶¶ 11, 13. There are no facts from which a reasonable fact finder could conclude that Trooper Boyer instituted the underlying proceeding with a malicious motive or intent such to state a viable malicious prosecution claim. *See Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir.2010) (to prevail on a malicious prosecution claim, a plaintiff must establish, *inter alia,* that the proceeding was begun with malice); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996) (malice may be proven by showing that the prosecutor had "a wrong or improper motive, something other than a desire to see the ends of justice served") (internal quotation marks omitted).

Finally, for the reason discussed above with regard to Trooper Boyer's entitlement to qualified immunity on the false arrest charge, he is also entitled to qualified immunity on the malicious prosecution claim. That is, under the circumstances it was objectively reasonable for reasonable officers to believe that there was probable cause to commence the prosecution for the offenses charged. Accordingly, the malicious prosecution claim is dismissed.

**c. Abuse of Process**

Plaintiff's third claim against Trooper Boyer is for malicious abuse of process in connection with the institution of the Town Court proceeding. "In the criminal context, malicious abuse of process is by definition a denial of procedural due process.... Procedural due process forbids the use of legal process for a wrongful purpose." *Abreu v. Romero,* 2010 WL 4615879, at \*8

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)

(Cite as: 2011 WL 5080404 (N.D.N.Y.))

(S.D.N.Y. Nov.9, 2010) (citation omitted). To state a claim for the malicious abuse of process, Plaintiff must prove that the Defendant (1) employed regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification (3) in order to obtain a collateral objective that is outside the legitimate ends of the process. *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003). "The pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." *Lopez v. City of New York,* 901 F.Supp. 684, 691 (S.D.N.Y.1995) (citing PSI *Metals v. Firemen's Ins. Co.,* 839 F.2d 42, 43 (2d Cir.1988)). In other words, Plaintiff "must claim that [Defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino,* 331 F.3d at 77. "In New York, such wrongful purposes have included economic harm, extortion, blackmail, and retribution." *Abreu,* 2010 WL 4615879, at *8 (citing *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 404, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975)).

**8** Plaintiff's malicious abuse of process claim fails as the facts are devoid of any allegations concerning any "collateral objective" that Defendants may have had in instituting criminal charges against Plaintiff. There is no factual basis upon which a reasonable fact finder could conclude that the issuance of the appearance tickets to Plaintiff was motivated by anything other than Trooper Boyer's good-faith belief that he had probable cause to conclude that Plaintiff had engaged in conduct that constituted trespass and/or criminal mischief. Furthermore, there is no evidence that Trooper Boyer had any involvement in the prosecution of the case against Plaintiff after he issued the appearance tickets on October 31, 2008. Under these uncontested facts, the claim fails as a matter of law.

Finally, and assuming *arguendo* that a viable malicious prosecution claim existed, Trooper Boyer is entitled to qualified immunity on the claim in that there existed, at the least, arguable probable cause to commence the criminal proceeding. This arguable probable cause provides an objectively reasonable justification for issuing process commencing the underlying proceeding. *Cf. Abreu,* 2010 WL 4615879, at *8 ("While probable cause

is not an element of an abuse of process claim, under New York law, a showing of probable cause at the time process issued suffices ... to establish excuse or justification for the purposes of a defense to abuse of process.") (internal quotation marks and citation omitted). Accordingly, the abuse of process claim is dismissed.

**V. CONCLUSION**

For the reasons discussed above, Defendant's motion for summary judgment [dkt. # 15] is **GRANTED** and all claims in this case are **DISMISSED.**

  **IT IS SO ORDERED.**

N.D.N.Y.,2011.

Ketchuck v. Boyer
Not Reported in F.Supp.2d, 2011 WL 5080404 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2014 WL 1289601 (N.D.N.Y.)
**(Cite as: 2014 WL 1289601 (N.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Charles Jacob RIEHL, Plaintiff,
v.
Donna MARTIN et al., Defendants.

No. 9:13–cv–439 (GLS/TWD).
Signed March 31, 2014.

Charles Riehl, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, Douglas J. Goglia, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*
GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Charles Jacob Riehl commenced this action against defendants Donna Martin, Howard Matasar, and Harold Graham, alleging violations of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) FN1 and his First Amendment right to the free exercise of religion pursuant to 42 U.S.C. § 1983. (Compl., Dkt. No. 1 at 11–20.) Defendants moved for summary judgment in lieu of an answer, (Dkt. No. 18), and Riehl responded to the motion with new allegations, (Dkt. No. 21), and also sought to amend certain dates alleged in his complaint, (Dkt. No. 20). FN2

> FN1. *See* 42 U.S.C. §§ 2000cc–2000cc–5.

> FN2. Riehl's request to amend the dates was granted. (Dkt. No. 34 at 22.)

In an Order and Report–Recommendation (R & R) filed December 19, 2013, Magistrate Judge Thérèse Wiley Dancks recommended that all claims be dismissed with the exception of Riehl's claim

under § 1983 for a Free Exercise Clause violation as against Martin and Matasar. (Dkt. No. 34 at 22.) Judge Dancks also recommended that Riehl be granted leave to amend his complaint. (*Id.*) Pending before the court are Riehl's objections to the R & R. (Dkt. No. 37.) For the reasons that follow, the R & R is adopted in its entirety.

### II. *Background*

Riehl, who was incarcerated at Auburn Correctional Facility during the relevant time period, identifies himself as an "observant orthodox Jewish man." (Defs.' Statement of Material Facts (SMF) ¶¶ 1–3, Dkt. No. 18, Attach. 4; Compl. at 13.) In dispute are Riehl's allegations that at the Passover Seder in April 2012, his meal contained chametz, a leavening agent, and was not prepared according to Jewish dietary law, which resulted in him not being able to partake in the holy day. (Compl. at 4, 22.) In response to defendants' motion for summary judgment, Riehl alleged new facts that significantly expanded upon his claim that he was served forbidden foods. (Dkt. Nos. 21 and 24.) Riehl's new allegations were considered by Judge Dancks. (Dkt. No. 34 at 11–13.)

### III. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See* Almonte v. N.Y. State Div. of Parole, No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error. FN3 *See id.*

> FN3. "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects

substantial rights." *Almonte,* 2006 WL 149049, at *6.

## IV. *Discussion*

Riehl's objections do not take issue with any particular aspect of Judge Dancks' recommendations. (Dkt. No. 37.) The thrust of his objections is merely a rehashing of arguments made in response to defendants' motion for summary judgment. ( *Compare* Dkt. Nos. 21 and 24, *with* Dkt. No. 37.) In particular, Riehl "objects" to portions of the declarations of Matasar and Martin. (Dkt. No. 37 at 1–4.) Since Riehl's objections do not point out any specific shortcomings in the R & R, and, instead, regurgitate earlier-raised arguments, review for clear error is warranted. *See Almonte,* 2006 WL 149049, at *4, *6.

**\*2** Having thoroughly reviewed the R & R, the court finds no clear error in Judge Dancks' recommendations, and adopts it in its entirety.

## V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Thérèse Wiley Dancks' Order and Report–Recommendation (Dkt. No. 34) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 18) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** as to all claims against Graham; and

**GRANTED** as to Riehl's RLUIPA claim against Martin and Matasar; and

**GRANTED** as to any request for injunctive relief; and

**DENIED** in all other respects, leaving only a claim under 42 U .S.C. § 1983 for a violation of the Free Exercise Clause as to Martin and Matasar; and

it is further

**ORDERED** that Riehl is granted leave to amend his complaint to assert the new allegations against Martin and Matasar raised in his opposition papers (Dkt. Nos. 21 and 24); and it is further

**ORDERED** that, with respect to any amended complaint filed by Riehl, he shall include factual allegations describing the role of Martin and Matasar sufficiently to allow the court to assess whether a plausible claim has been stated against them; and it is further

**ORDERED** that, if Riehl files an amended complaint, it shall be a wholly integrated and complete pleading with separately numbered allegations that does not rely upon, or incorporate by reference, the original complaint; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

### *ORDER and REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This *pro se* civil rights action, commenced by Plaintiff Charles Riehl pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D .N.Y. L.R. 72.3(c). Plaintiff claims that while he was confined in Auburn Correctional Facility ("Auburn"), Defendants Donna Martin ("Martin"), Food Administrator at Auburn; Howard Matasar ("Matasar"), a Rabbi assigned to Auburn on a part-time basis; and Harold Graham ("Graham"), Auburn Superintendent, were guilty of violating his First Amendment right to the free exercise of religion, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.,* and of negligence in serving him food that violated Jewish law at the first Passover Seder in April of 2012. (

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1289601 (N.D.N.Y.)
**(Cite as: 2014 WL 1289601 (N.D.N.Y.))**

*See generally* Dkt. No. 1.) Plaintiff seeks injunctive relief and compensatory and punitive damages. (Dkt. No. 1 at 21.)

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in lieu of answering Plaintiff's Complaint. (Dkt. No. 18.) Plaintiff has filed papers in opposition to the motion. (Dkt. Nos. 21 and 24.) Plaintiff has also filed a motion to amend his Complaint to change the dates for Passover in 2012 from April 18 through April 26, 2012 to the correct dates, April 6 through April 14, 2012.[FN1] (Dkt. No. 20.) Defendants have opposed the motion on futility grounds. (Dkt. No. 23.) I hereby grant Plaintiff's motion to amend his Complaint to reflect the correct dates for Passover in 2012, and direct that for purposes of this motion, Plaintiff's Complaint be deemed so amended. For the reasons that follow, the Court recommends that Defendants' motion for summary judgment (Dkt. No. 18) be granted in its entirety as to Defendant Graham. The Court further recommends that the motion be granted in part and denied in part, without prejudice, as to Defendants Martin and Matasar, and that Plaintiff be granted leave to file an amended complaint asserting the new claims set forth in his opposition papers.

> FN1. Plaintiff states in his motion to amend that "[a]lso in consideration of the courts in amending this complaint also plaintiff will ask the court to afford compensation for actual damages as well [as] punitive damages for relief." (Dkt. No. 20.) Inasmuch as Plaintiff's Complaint, as originally filed, seeks relief in the form of both compensatory and punitive damages, there is no need for amendment of the Complaint with regard to the relief sought. (Dkt. No. 1 at 21.)

## I. BACKGROUND

**\*3** In his Complaint, Plaintiff identifies himself as an Orthodox Jew. (Dkt. No. 1 at 13.) Plaintiff claims that the food served to him at the Seder held on the first night of Passover in April of 2012, was not prepared according to the kashrut (Jewish dietary law) in that it contained chametz,[FN2] which Jews are prohibited from eating during Passover. (Dkt. No. 1 at 4.) According to Plaintiff, because the foods were not prepared in accordance with the kashrut, he was unable to partake of the meal. *Id.* Plaintiff contends that the improper handling and preparation of food during Passover can result in physical and mental harm to observant Jews. *Id.* at 8–9. Plaintiff claims that Defendants Martin and Matasar were both negligent in violating his right under the free exercise clause to eat properly prepared food for Passover. (Dkt. No. 1 at 11, 14–16.)

> FN2. The Torah directs Jews not to eat "chametz" during Passover. *See* Exodus 12:15. "Chametz" is "leven"—food made of grain and water that has been allowed to ferment and "rise." *See* http://www.chabad.org/library/how-to/wizard_cdo/aid/1755/jewish/1–What–isChametz.htm; *see also* Dkt. No. 1 at 22–23, 35–39.

Plaintiff has not described the meal about which he complains other than to allege in his Complaint (Dkt. No. 1) that it contained chametz, and in his opposition papers that sardines were removed from the can and placed in paper cups, and that the salad dressing, condiments, butter, and the hot meal served were not labeled kosher for Passover.[FN3] (Dkt. Nos. 21 at ¶ 1; 24 at ¶ 4.) Plaintiff has not identified the type(s) of chametz he found in the meal. (*See* Dkt. No. 1.)

> FN3. Plaintiff claims to have told Defendant Matasar about the sardines in cups, and that the salad dressing, condiments and butters served on the first night Seder were not kosher for Passover. (Dkt. No. 24 at ¶ 4.)

Defendant Martin was Food Administrator at Auburn during Passover in 2012. (Dkt. No. 18–6 at

¶ 1.) As Food Administrator, Martin was responsible for overseeing and coordinating the preparation and provision of food to inmates, including ensuring that proper amounts of food were obtained; food was stored, handled and prepared properly; and kitchen facilities were properly maintained. *Id.* at ¶ 2. According to Martin, meals provided to Jewish inmates who keep kosher have been the same at Auburn for a number of years.[FN4] *Id.* at ¶ 4. The inmates are provided with cold alternative diets ("CADs"), which are kosher, or kosher for Passover as appropriate, on a daily basis. *Id.* An exception is made for the evening meals on certain Jewish holidays such as the two nights of Shavout, the two nights of Rosh Hashana, the first and last nights of Sukkoth, and all eight nights of Passover. *Id.*

> FN4. *See also* Defendant Matasar's Declaration. (Dkt. No. 18–5 at ¶ ¶ 6–8.)

Observant Jewish inmates are provided with pre-packaged and prepared hot meals certified as kosher by the Union of Orthodox Congregations ("OU") for Shavout, Rosh Hashana, and Sukkoth. *Id* . at ¶ 5. The kosher meals, manufactured by Milmar Food Group, LLC, are sold under the "Valley Stream" label, and purchased from SYSCO Food Services Corporation ("SYSCO") by the Department of Corrections and Community Supervision ("DOCCS"). *Id.* Martin has submitted an exemplar of a label from the boiled seasoned beef dinner, bearing the OU kosher certification trademark, as an example of the meals served for Shavout, Rosh Hashana, and Sukkoth. *Id.;* Dkt. No. 18–7 at 1.

Regular kosher certification is not sufficient for Passover, and foods that are kosher during the rest of the year are not kosher for Passover. (Dkt. No. 18–5 at ¶ 8.) Therefore, according to Martin, on the eight nights of Passover, Jewish inmates are given pre-packaged and prepared hot Spring Valley meals certified by OU as "Kosher for Passover." (Dkt. No. 18–6 at ¶ 6.) Martin has also submitted an exemplar of a label from the packaging for the baked fish tomato herb dinner labeled "Kosher for Passover." (Dkt. No. 18–8 at 1–2.) A March 21, 2012, invoice from SYSCO for meals delivered to the DOCCS Food Production Center in Rome, New York included a total of 147 kosher for Passover meals and 42 kosher beef in broth boiled dinners not labeled as kosher for Passover and not certified as kosher for Passover on the Orthodox Union December 28, 2011, kosher certification letter.[FN5] (Dkt. Nos. 18–10 and 18–9.) Martin's involvement in providing kosher and kosher for Passover meals to Jewish inmates is limited to ordering the proper number of meals from the Food Production Center, based on the count of observant Jewish inmates provided by the Facility Rabbi; ensuring that the meals are properly stored and refrigerated upon delivery; and making sure they are warmed before being served to the inmates. (Dkt. No. 18–6 at ¶ 9.) Defendant Matasar visits correctional facility kitchens approximately monthly to ensure that the food provided to Jewish inmates is prepared in accordance with Jewish dietary laws of kashrut. (Dkt. No. 18–5 at ¶ 3.) Matasar has no responsibility for, or direct involvement in, providing food to inmates, and he claims to have played no role in the preparation or provision of meals provided to Plaintiff during the 2012 Passover holiday. *Id.* at 18–5 at ¶ ¶ 3, 10.

> FN5. Except for noting that there are Jewish holidays in which regular Spring Valley kosher meals are served, Defendants have provided no explanation for why the 42 beef in broth boiled dinners, which were not certified as Kosher for Passover, were purchased at the same time as the Kosher for Passover meals and were identified as "frozen Passover dinners" on the description of goods received at the Food Production Center on March 21, 2012. (Dkt. Nos. 18–5 at ¶ 7; 18–6 at ¶ 5; 18–9 at 2.)

**\*4** Matasar and Martin both claim to be unaware of any instance in which Plaintiff has been denied a Passover meal, or provided with a meal that was not kosher for Passover, and to have no

reason to suspect that the pre-packaged and pre-pared kosher for Passover hot meals provided to Plaintiff during Passover contained foods that were not kosher for Passover. (Dkt. Nos. 18–5 at ¶ 9; 18–6 at ¶ 10.) Like Plaintiff, Defendants have failed to describe the meal served to Plaintiff at the first Passover Seder in 2012.

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint and applied for leave to proceed *in forma pauperis* in this action on April 22, 2013. (Dkt. Nos. 1 and 2.) On June 10, 2013, Plaintiff moved for the appointment of counsel. (Dkt. No. 10.) In a Decision and Order filed on June 25, 2013, Chief Judge Sharpe granted Plaintiff's *in forma pauperis* application, denied his motion for the appointment of counsel without prejudice, and dismissed Plaintiff's claims for money damages against Defendants in their official capacities with prejudice on the grounds that the claims are barred by the Eleventh Amendment to the Constitution. (Dkt. No. 12.) The Summons and Complaint were served on Defendants Martin, Graham, and Matasar on July 2, 15, and 17, 2013, respectively. (Dkt.Nos.15–17.)

Defendants filed the motion for summary judgment in lieu of answering the Complaint now before me for Report and Recommendation on July 19, 2013. [FN6] (Dkt. No. 18.) Plaintiff thereafter filed his motion to amend his Complaint to reflect the proper dates for Passover in 2012 (Dkt. No. 20) and his opposition to Defendants' motion. (Dkt. Nos. 21 and 24.)

> FN6. Plaintiff moved for a default judgment on August 19, 2013, based upon Defendants' failure to answer the Complaint. (Dkt. No. 28.) Defendants opposed the motion and requested that the obligation to answer be stayed pending a decision on their summary judgment motion (Dkt. No. 29), and on September 19, 2013, the Court issued a Text Order granting Defendants' request for a stay. (Dkt. No. 32.)

In August of 2013, Plaintiff filed a second motion for assignment of counsel. (Dkt. No. 25.) The Court denied the motion in a September 27, 2013, Decision and Order. (Dkt. No. 33.)

## III. APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment. *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 204 (2d Cir.2009) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

**\*5** In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998) ("pro se parties are to be given special latitude on summary judgment motions.") (citations and internal quotation marks omitted). However, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).[FN7]

> FN7. Copies of unpublished decisions cited herein will be mailed to Plaintiff as a *pro se* litigant. *See Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

## IV. ANALYSIS

### A. Deficiencies in Plaintiff's Opposition Papers

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se* ] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the Statement of Material Facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3).[FN8] Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[FN9] and (2) the nonmovant, if proceeding *pro se,* has been specifically advised of the possible consequences of failing to respond to the motion.[FN10]

*See Champion, v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, and in light of the fact that Defendants have moved for summary judgment so early in the litigation, I have opted to review the entire record in determining if there are material facts in dispute.

> FN8. L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." Plaintiff's partial response to Defendants' Statement, found in his Motion to Dismiss Summary Judgment, is limited to disagreement with ¶¶ 14, 18, and 22 in Defendants' Statement, and as to those, Plaintiff has failed to set forth specific citations to the record where the claimed factual issue arises.

> FN9. L.R. 7.1(a)(3) provides that *"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* However, *see Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) ("[I]n determining whether the moving party has met his bur-

den of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

FN10. Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 24 at 3.)

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). Where, as here, the Court elects to conduct an independent review of the record on a motion for summary judgment, a plaintiff's verified complaint should be treated as an affidavit.FN11 *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted). Plaintiff's Opposition to the Declaration of Defendant Howard Matasar (Dkt. No. 24), which was signed under penalty of perjury, also constitutes admissible evidence that can be considered in opposition to Defendants' motion. *See* 28 U.S.C. § 1746 (authorizing the use of declarations made under penalty of perjury when an affidavit is required or permitted to be used).

FN11. Plaintiff's Complaint in this case was properly verified by declaration under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

**\*6** Plaintiff's Motion to Dismiss Summary Judgment (Dkt. No. 21) is unsworn, and unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g., Witzenburg v. Jurgens,* No. CV–05–4827 (SJF)(AKT), 2009 WL 1033395, at \*11, 2009 U.S. Dist. LEXIS 32126 (E.D.N.Y. April 14, 2009) (unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment). Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g., Hamm v. Hatcher,* No. 05 Civ. 503(ER), 2013 WL 71770, at \*7, 2013 U.S. Dist. LEXIS 2203, \*19–20 (S.D.N.Y. Jan.7, 2013) (to afford *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa,* No. 09CV718 (HBS), 2012 WL 2401574, at \*7, 2012 U.S. Dist. LEXIS 87834, at \*20–22 (W.D.N.Y. June 25, 2012). In deference to Plaintiff's *pro se* status, and because the action is at such an early stage, the Court will consider Plaintiff's unsworn Motion to Dismiss Summary Judgment in opposition to Defendants' motion.

**B. New Claims Raised by Plaintiff in his Opposition Papers**

Plaintiff's Complaint alleges that there was chametz in the meal served at the Seder on the first night of Passover in 2012. (Dkt. No. 1 at 4, 18.) However, in his opposition to Defendants' summary judgment motion, Plaintiff goes well beyond the allegations in his Complaint. He claims that in addition to containing chametz, the salad dressing, condiments, butter, and the hot meal served at the first Seder were not labeled kosher for Passover. (Dkt. Nos. 21 at ¶ 1; 24 at ¶ 4.) Plaintiff also claims that the 42 kosher, but not kosher for Passover, beef in

broth boiled dinners listed in the SYSCO invoice submitted by Defendants were given to inmates throughout Passover in 2012. (Dkt. No. 21 at ¶ 3.) He does not, however, specifically claim that he was served one of those beef dinners at the Seder on the first evening of Passover. In addition, in his opposition papers, Plaintiff complains that during Passover in 2012, the sardines and tuna served for lunch each day were taken out of the cans and placed in small dixie cups in violation of kashrut, the food in the lunch bags given inmates during Passover contained chametz, and the dressings, butters, and tuna fish were not kosher for Passover. (Dkt. No. 21 at ¶ 6.) According to Plaintiff, when he complained to Defendant Matasar about the lunch bags containing chametz and asked him to go to the kitchen and fix the situation, Matasar responded that Plaintiff was in prison and he should not come to prison if he wanted to eat kosher. Plaintiff claims Matasar told him he could eat the lunches or not. *Id.*

**\*7** In their Reply Memorandum of Law, Defendants argue that under well-settled law, Plaintiff cannot raise new claims in papers in opposition to a motion for summary judgment. (Dkt. No. 22 at 4–5.) *See, e.g., Shah v. Helen Hayes Hosp.,* 252 F. App'x 364, 366 (2d Cir.2007) (holding that the district court did not err in disregarding allegations the plaintiff raised for the first time in response to the defendant's motion for summary judgment); *Jones v. Fischer,* No. 9:10–cv–1331 (GLS/ATB), 2013 WL 5441353, at \*15, n. 23, 2013 U.S. Dist. LEXIS 140318, at \*47, n. 23 (N.D.N.Y. Sept. 27, 2013) ("Generally a party may not raise new claims in his or her response to a motion for summary judgment.") (collecting cases). However, the stated rationale for disregarding claims first asserted in opposition to a motion for summary judgment does not fit in this instance. *See Beckman v. U.S. Postal Service,* 79 F.Supp.2d 394, 407–08 (S.D.N.Y.2000) ("Although a complaint need not correctly plead every legal theory supporting the claim, at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an ap-

propriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.") (citations and internal quotation marks omitted); *Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.,* 963 F.Supp. 1342, 1359 (S.D.N.Y.1997) (attempt by plaintiff to add claim never addressed in the complaint is inappropriate in a brief in opposition to a motion for summary judgment made after the close of discovery without leave of court); *see also Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 219–20 (N.D.N.Y.2008) (McAvoy, J. *adopting* ReportRecommendation of Lowe, M.J.) (in an action filed in November of 2005, where discovery had closed in December of 2006, court concluded that new factual allegations raised by plaintiff in opposition to summary judgment motion should not be considered, where "the four new allegations [were] not made in response to a motion to dismiss (which typically occurs relatively early in an action, before discovery has occurred) ... [and] the net effect of permitting Plaintiff to so change the landscape of his claims at this late stage of the action would be to deprive Defendants of the fair notice envisioned by Fed.R.Civ.P. 8.").

Because Defendants moved for summary judgment in lieu of filing an answer within weeks of service of Plaintiff's Complaint and prior to any discovery in the action, the Court will consider the new factual allegations and claims raised in Plaintiff's opposition papers.

**C. Plaintiff's Claims Under RLUIPA**

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise" of an institutionalized person unless the government shows that the burden imposed "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering" that interest. 42 U.S.C. § 2000cc–1(a). RLUIPA includes an express private

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cause of action: "A person may assert a violation of [RLUIPA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). "Government" includes, *inter alia,* States, counties, municipalities, their instrumentalities and officers, and persons acting under color of state law. 42 U.S.C. § 2000cc–5(4)(A).

**\*8** In his June 25, 2013, Decision and Order, Chief Judge Sharpe dismissed Plaintiff's RLUIPA and § 1983 claims for money damages against Defendants in their official capacities on the grounds that those claims are barred by the Eleventh Amendment.FN12 (Dkt. No. 12 at 7.) Recently, in *Washington v. Gonyea,* 731 F.3d 143 (2d Cir.2013), the Second Circuit held that RLUIPA does not create a private cause of action against state officers in their individual capacities. *Id.* at 145–46. Therefore, I recommend that Defendants' motion for summary judgment dismissing Plaintiff's RLUIPA claims against them in their individual capacities be granted.

> FN12. Plaintiff has requested a temporary restraining order against Defendants in his Complaint. (Dkt. No. 1 at 21.) All of the events of which Plaintiff complains took place at Auburn, where Defendants are employed. (*See generally* Dkt. No. 1.) Plaintiff has since been transferred from Auburn and is presently incarcerated at Great Meadow Correctional Facility ("Great Meadow"). (Dkt. No. 31.) Great Meadow is not one of the correctional facilities to which Defendant Matasar is assigned. (Dkt. No. 18–5 at ¶ 1.) Therefore, I recommend that Defendants be granted summary judgment dismissing Plaintiff's request for what appears to be injunctive relief under RLUIPA and the Free Exercise Clause as moot. *See Washington,* 731 F.3d at 144, n. 1; *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006) (transfer from a correctional facility generally moots a

claim for injunctive relief against officials in the facility).

**D. Plaintiff's Free Exercise Claim Against Defendant Graham**

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983 ." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.").* "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at \*6, 2012 U.S. Dist. LEXIS 25367, at \*22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (citing *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who

committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 872, 873 (2d Cir.1995). FN13

> FN13. The Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law.

The only allegations in the Complaint regarding Graham are that he does not have "a strong institutional interest in the effectiveness of beliefs in [Plaintiff's] religious practices of observing Judaism and the holy day of Passover," and that he was negligent with regard to the Passover menu. FN14 (Dkt. No. 1 at 14.) In his opposition papers, Plaintiff's sole claim of personal involvement by Graham is that Graham told Defendant Martin to take the sardines and tuna out of the cans before serving them to the inmates which, according to Plaintiff, violated the kashrut. (Dkt. No. 21 at ¶ 6.) FN15 "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). The reach of the free exercise clause extends to "an inmate's diet and participation in religious meals." *Johnson v. Guiere,* No. 9:04–CV–57 (DNH/DEP), 2007 WL 3046703, at *4, 2007 U.S. Dist. LEXIS 98781, *14–15 (N.D.N.Y. Oct.17, 2007) ("Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does un-

constitutionally burden their free exercise rights.").

> FN14. Mere negligence is insufficient to establish liability on the part of a prison official under § 1983. *See Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

> FN15. Plaintiff is required to demonstrate that the beliefs he professes are "sincerely held" and in his "own scheme of things, religious." *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citation and internal quotation marks omitted). Plaintiff has described himself as an "observant Orthodox Jewish man" (Dkt. No. 1 at 13), and Defendants have not disputed Plaintiff's self-characterization. Therefore, the Court will assume for purposes of Defendants' motion that Plaintiff's Jewish faith is a sincerely held religious belief.

**\*9** However, the protections afforded inmates by the First Amendment are not as extensive as the rights enjoyed by ordinary citizens because "[a] prison inmate ... retains [only] those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004) (citation and internal quotation marks omitted); *see also Ford,* 352 F.3d 588 ("Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, ... are the interests of prison officials charged with complex duties arising from administration of the penal system.") (internal quotation marks and brackets omitted).

The governing standard in determining whether restrictions on an inmate's religious practices passes First Amendment muster is one of reasonableness. *Ford,* 352 F.3d at 588 ("the free exercise claims of prisoners are therefore judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights") (additional internal

quotation marks omitted). A generally applicable policy will not be held to violate an inmate's right to free exercise of religion if the policy "is reasonably related to legitimate penological interests." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citation and internal quotation marks omitted).

In *Russell v. Ricks,* No. 9:02–CV–0940 (LEK/DEP), 2006 WL 1555468, at * 6, 2006 U.S. Dist. LEXIS 39772, at * 18 (N.D.N.Y. May 31, 2006), the district court noted that both district courts in the Second Circuit and New York appellate courts "have uniformly held that can tops constitute weapons." (punctuation omitted) (collecting cases); *see also Odom v. Dixion,* No. 04–CV–889F, 2008 WL 466255, at *7, 2008 U.S. Dist. LEXIS 11748, at *19–20 (W.D.N.Y. Feb.15, 2008) (accepting defendants' assertion that because can lids have sharp metal edges, they can be fashioned into weapons and rejecting plaintiff's claim that his free exercise rights were violated by permitting a non-Jew to open cans of sardines and tuna and place the contents in paper cups); *Dodge v. County of Orange,* 282 F.Supp.2d 41, 68–69 (S.D.N.Y.2003) (listing a bent can lid as a weapon); *People v. Jones,* 185 A.D.2d 470, 585 N.Y.S.2d 872, 873 (3d Dep't 1992) (testimony established that an altered can lid could be used as a weapon). In light of the general recognition that can lids can constitute weapons in the hands of inmates, the Court finds that even if Graham did direct Martin to take the sardines and tuna out of the cans, the directive was reasonably related to legitimate penological interests and, therefore, did not violate Plaintiff's rights.[FN16]

> FN16. The same would be true as to Plaintiff's claims against Defendants Martin and Matasar with respect to removal of the sardines and tuna from cans.

Based upon the foregoing, I recommend that summary judgment be granted dismissing Plaintiff's First Amendment free exercise claim against Defendant Graham in his individual capacity.

**E. Plaintiff's First Amendment Free Exercise Clause Claim Against Defendants Martin and Matasar**

**\*10** The free exercise claim against Defendants Martin and Matasar in Plaintiff's Complaint is limited to the alleged presence of chametz in the Seder meal served him on the first evening of Passover in 2012. (*See generally* Dkt. No. 1.) In his Complaint, Plaintiff has himself described Defendants Martin and Matasar's actions in allowing him to be served a meal that contained chametz at the first Passover Seder as a negligent violation of his constitutional rights. (Dkt. No. 1 at 11, 14–16.) Given the evidence presented by Martin and Matasar of the established practice at Auburn of acknowledging inmates' religious dietary requirements by giving them prepackaged kosher for Passover evening meals, the record does not support a finding that the presence of chametz in Plaintiff's meal at the first Seder was the result of established prison policy or an intentional disregard of Plaintiff's right to food satisfying the dictates of his faith, as opposed to a mistake or negligence as Plaintiff has himself alleged. (Dkt. No. 1 at 11, 14–16.) Even if Martin and Matasar were negligent in failing to ensure that Plaintiff was given kosher for Passover food for the Seder, conduct "amount [ing] to [nothing] more than negligence, ... is not actionable under the First Amendment."[FN17] *Tafari v. Brown,* No. 9:10–CV–1065 (GTS/DRH), 2012 WL 1098447, at *6, 2012 U.S. Dist. LEXIS 45055, at *16 (N.D.N.Y. Mar.30, 2012); *see also Gallagher v. Shelton,* 587 F.3d 1063, 1070 (10th Cir.2009) (allegations of isolated, negligent acts with respect to prisoner's receipt of a kosher diet did not state a First Amendment claim); *Lovelace v. Lee,* 472 F.3d 174, 201 (4th Cir.2006) ("[n]egligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause").[FN18]

> FN17. Although Matasar has acknowledged that his responsibilities as Rabbi at Auburn included visiting the kitchen at Auburn to ensure that foods provided to Jewish inmates were prepared in accord-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ance with kashrut, there is no evidence he was personally involved in purchasing, preparing, or serving Plaintiff's meal on the first night of Passover. (Dkt. No. 18–5 at ¶ 3.) As previously noted, personal involvement is a prerequisite to an award of damages under § 1983. *McKinnon,* 568 F.2d 934.

**FN18.** Martin and Matasar also argue that even if Plaintiff did not receive a proper kosher for Passover meal the first Seder of Passover, it was *de minimis* and cannot be found to have substantially burdened his sincerely held religious beliefs. (Dkt. No. 18–2 at 9–12.) *See Salahuddin v. Goord,* 467 F.3d at 274–75 (inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."). There is a substantial amount of case law finding that denial of a religious meal on a small number of occasions is *de minimis* and does not give rise to a First Amendment claim. *See, e.g., Wilson v. Woodbourne Correctional Facility,* No. 9:11–CV–1088 (DNH/AT), 2012 WL 1377615, at \*3, 2012 U.S. Dist. LEXIS 54989, at \*8 (N.D.N.Y. March 21, 2012); (the withholding of a single religious meal is at most a *de minimis* burden on a prisoner's religious expression); *Odor v. Dixon,* 2008 466255, at \*11 (failure to provide inmate with kosher meals on 7 out of 33 occasions not sufficient under the First Amendment). However, in *Ford,* 352 F.3d at 594, n. 12, the Second Circuit found that the Eid ul Fitr feast was sufficiently unique in its importance within Islam to distinguish that case from those in which the inability to provide a small number of meals commensurate with an inmate's religious beliefs was a *de minimis* burden, and indicated that the court was inclined to hold that the plaintiff had established a substantial burden as a result of

missing the religious feast. *See also Shakur,* 391 F.3d at 120 (reversing the district court holding that "the missing of a single Eid ul Fitr feast simply does not amount to a 'substantial burden' on his religious exercise.") A Passover Seder has been recognized as being greatly significant to Jewish adherents. *See, e.g., Whitney v. Brown,* 882 F.2d 1068, 1074 (6th Cir.1989) (explaining Seder "marks the exodus of the Jewish people from Egypt. It is a most sacred time for believers in the Jewish faith, both for historic reasons and for its celebration of family and community ...."). Therefore, if Plaintiff was intentionally denied a meal that was kosher for Passover, whether or not the denial was *de minimis* could conceivably present a question of fact.

While there is no evidence establishing more than possible negligence on the part of Defendants Martin and Matasar with regard to the allegations regarding chametz in the food served at the first Seder, Plaintiff's opposition papers include new claims of the arguably knowing violation of his First Amendment rights by Martin and Matasar during Passover of 2012. Martin, who acknowledges being responsible for overseeing and coordinating the preparation and provision of food to inmates, and Matasar, who acknowledges being responsible for checking the kitchen at Auburn to ensure that food is prepared in accordance with kashrut, have stated that during Passover, Jewish inmates at Auburn are given meals that are kosher for Passover. (Dkt. Nos. 18–5 at ¶¶ 2, 6; 18–6 at ¶ 4.) However, in his opposition papers, Plaintiff claims that the salad dressing, condiments, and butter served at the first Seder were not kosher for Passover. (Dkt. Nos. 21 at ¶ 1; 24 at ¶ 4.) In addition, Plaintiff has described the CAD lunch bags given to Jewish inmates during Passover as containing chametz throughout the whole bag. (Dkt. No. 21 at ¶ 6.) Moreover, according to Plaintiff, when he complained to Matasar about the lunch bags containing chametz, Matasar told him if he wanted to eat kosh-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

er he should stay out of prison. *Id.* An intentional disregard of Plaintiff's right to a diet consistent with his sincerely held religious beliefs could constitute a violation of his First Amendment rights. *See Johnson v. Guiffere,* 2007 WL 3046703, at *4.

**\*11** Martin states in her Declaration that pre-packaged kosher, but not kosher for Passover, meals like the boiled seasoned beef dinner (Dkt. No. 18–7) are given to inmates on Jewish holidays other than Passover. (Dkt. No. 18–5 at ¶ 5.) However, Plaintiff claims that the boiled seasoned beef dinners were served throughout Passover, despite not being kosher for Passover. (Dkt. No. 21 at ¶ 3.) Given that the DOCCS Food Production Center receipt submitted by Martin includes the boiled beef dinners in the list of "frozen Passover dinners," it is conceivable that, whether inadvertently or intentionally, those meals were served during Passover as Plaintiff contends. (Dkt. No. 18–9.)

Plaintiff's new claims against Defendants Martin and Matasar have been asserted before discovery, at a point where it would not be prejudicial to Defendants to allow him to amend his complaint to include them. Therefore, giving due deference to Plaintiff's *pro se* status, the Court recommends that Defendants Martin and Matasar's motion for summary judgment with regard to Plaintiff's free exercise claim against them in their individual capacities be denied without prejudice, and that Plaintiff be granted leave to file an amended complaint including the new claims asserted in his opposition papers. FN19

FN19. Had Defendants made a pre-discovery motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure rather than a summary judgment motion in lieu of an answer, Plaintiff, as a *pro se* complainant, would likely have been found entitled to an opportunity to amend his Complaint. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (where a *pro se* complaint fails to state a cause of action, the court

generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated" unless "the problem with [the plaintiff's] causes of action is substantive" and could not be cured by a better pleading) (citation and internal quotation marks omitted).

**ACCORDINGLY,** it is hereby

**ORDERED** that Plaintiff's motion for leave to amend his Complaint to reflect the correct dates for Passover in 2012 (Dkt. No. 20) is **GRANTED;** and it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 18) be *GRANTED* as to Defendant Graham; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 18) be ***GRAN-TED*** in part and ***DENIED*** in part, without prejudice, as to Defendants Martin and Matasar as follows:

1. Summary judgment be **GRANTED** to Defendants Martin and Matasar on Plaintiff's claim under RLUIPA; and

2. Summary judgment be ***DENIED*** to Defendants Martin and Matasar, without prejudice, on Plaintiff's claim under 42 U.S.C. § 1983 for violation of his rights under the First Amendment Free Exercise Clause; and it is further

**RECOMMENDED** that Plaintiff be granted leave to amend his Complaint to assert the new claims against Defendants Martin and Matasar set forth in his papers in opposition to Defendants' motion for summary judgment (Dkt. Nos. 21 and 24); and it is further

**RECOMMENDED** that with respect to any amended complaint filed by Plaintiff, he be instructed to include factual allegations describing the role

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

of Defendants Martin and Matasar sufficiently to allow the Court to assess whether a plausible claim has been stated against them; and that the amended complaint be a wholly integrated and complete pleading, with separately numbered allegations, that does not rely upon, or incorporate by reference, the complaint previously filed in the action; and it is hereby

**ORDERED** that in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam), the Clerks Office provide Plaintiff with copies of the following unpublished decisions: *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 (S.D.N.Y. Oct. 28, 1999); *Witzenburg v. Jurgens,* No. CV–05–4827 (SJF) (AKT), 2009 WL 1033395 (E.D.N.Y. April 14, 2009); *Hamm v. Hatcher,* No. 05 Civ. 503(ER), 2013 WL 71770 (S.D.N.Y. Jan.7, 2013); *Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574 (W.D.N.Y. June 25, 2012); *Jones v. Fischer,* No. 9:10–cv–1331 (GLS/ATB), 2013 WL 5441353 (N.D.N.Y. Sept. 27, 2013); *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919 (N.D.N.Y. Feb.28, 2012); *Johnson v. Guiffere,* No. 9:04–CV–57, 2007 WL 3046703 (N.D.N.Y. Oct.17, 2007); *Russell v. Ricks,* No. 9:02–CV–0940 (LEK/DEP), 2006 WL 1555468 (N.D.N.Y. May 31, 2006); *Tafari v. Brown,* No. 9:10–CV–1065 (GTS/DRH), 2012 WL 1098447 (N.D.N.Y. Mar.30, 2012); *Wilson v. Woodbourne Correctional Facility,* No. 9:11–CV–1088 (DNH/ATB), 2012 WL 1377615 (N.D.N.Y. March 21, 2012).

**\*12** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

Filed Dec. 19, 2013.

N.D.N.Y.,2014.
Riehl v. Martin
Slip Copy, 2014 WL 1289601 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.